Brent O. Hatch (5715)
Shaunda L. McNeill (144468)
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666
bhatch@hjdlaw.com
smcneill@hjdlaw.com

Richard L. Stone (pro hac vice to be filed)
Julie A. Shepard (pro hac vice to be filed)
Amy M. Gallegos (pro hac vice to be filed)
JENNER & BLOCK LLP
633 West 5th Street, Suite 3600
Los Angeles, CA  90071
Telephone: (213) 239-5100
Facsimile: (213) 239-5199
rstone@jenner.com
jshepard@jenner.com
agallegos@jenner.com

*Attorneys for Plaintiffs,*
*Community Television of Utah, LLC d/b/a KSTU FOX 13,*
*KUTV Licensee, LLC d/b/a KMYU and KUTV, and Fox Broadcasting Company*

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| COMMUNITY TELEVISION OF UTAH, LLC d/b/a KSTU FOX 13, KUTV LICENSEE, LLC d/b/a KMYU AND KUTV, and FOX BROADCASTING COMPANY, <br><br> Plaintiffs, <br><br> vs. <br><br> AEREO, Inc., <br><br> Defendant. | **MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT** <br><br> Civil No. 2:13-cv-00910 <br><br> Magistrate Judge Paul M. Warner <br><br> HEARING REQUESTED |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 5

PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION .................................... 7

    I.  Standard For Granting A Preliminary Injunction ......................................... 7

    II.  Plaintiffs Are Likely To Succeed On The Merits ....................................... 8

        A.  Aereo Publicly Performs Plaintiffs' Copyrighted Works ...................................... 8

        B.  The Court Should Reject Aereo's Attempt To Rely On The Second Circuit's Misreading Of The Transmit Clause ................................................ 11

          1.  *Cablevision* And *Aereo* ................................................................. 11

          2.  The Flaws In The Second Circuit's Interpretation Of The Transmit Clause .. 15

            a.  The *Cablevision* Court Confused The Terms "Performance" And "Transmission." ................................................................. 15

            b.  Determining Whether A Performance Is Public Based On Whether The Transmissions Emanate From A Master Copy Is Illogical And Not Consistent With The Statute's Plain Language ................................ 18

            c.  The *Cablevision* And *WNET* Courts Incorrectly Found That The Plain Language Of The Statute Would Cause Private Performances To Be Infringing ...................................................... 20

          3.  It Is Not A Defense For Aereo To Say That It Allows Consumers To Access And Record Over-The-Air Broadcasts ...................................................... 21

III.   Plaintiffs Will Suffer Irreparable Harm Absent An Injunction ................................. 23

IV.   The Balance Of Harms Tips Decidedly In Favor Of An Injunction......................... 27

V.   Public Policy Favors An Injunction ......................................................................... 27

CONCLUSION.................................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Broad. Cos., Inc. v. Aereo, Inc.*,
874 F. Supp. 2d 373 (S.D.N.Y. 2012)........................................................................14, 23, 25

*Apple Computer, Inc. v. Franklin Computer Corp.*,
714 F.2d 1240 (3d Cir. 1983)..................................................................................28

*Autoskill Inc. v. Nat'l Educ. Support Sys., Inc.*,
994 F.2d 1476 (10th Cir. 1993) ...........................................................................26, 27

*Cadence Design Sys., Inc. v. Avant! Corp.*,
125 F.3d 824 (9th Cir. 1997) ...............................................................................27

*Capital Cities Cable, Inc. v. Crisp*,
467 U.S. 691 (1984)...................................................................................2, 11, 22

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
536 F.3d 121 (2d Cir. 2008)............................................................................ passim

*Case v. Hatch*,
--- F.3d ---, 2013 WL 1501521 (10th Cir. 2013) .................................................16

*CBS Broad. Inc. v. FilmOn.com*,
No. 10-7532, Dkt. No. 8 (S.D.N.Y. Nov. 22, 2010) ...........................................23

*Corley v. United States*,
556 U.S. 303 (2009)...............................................................................................17

*Eldred v. Ashcroft*,
537 U.S. 186 (2003)...............................................................................................27

*Fortnightly Corp. v. United Artists Television, Inc.*,
392 U.S. 390 (1968)...............................................................................................22

*Fox Television Stations, Inc. v. FilmOn X LLC*,
--- F. Supp. 2d ---, 2013 WL 4763414 (D.D.C. 2013)..................................... passim

*Fox Television Systems, Inc. v. BarryDriller Content Sys., PLC*,
915 F. Supp. 2d 1138 (C.D. Cal. 2012) ......................................................... passim

*Gates Rubber Co. v. Bando Chem. Indus., Ltd.*,
9 F.3d 823 (10th Cir. 1993) ..................................................................................8

*Hobby Lobby Stores, Inc. v. Sebelius*,
    723 F.3d 1114 (10th Cir. 2013) ...................................................................7

*L.A. News Serv. v. Tullo*,
    973 F.2d 791 (9th Cir. 1992) ...................................................................23

*Medias & Co., Inc. v. Ty, Inc.*,
    106 F. Supp. 2d 1132 (D. Colo. 2000)......................................................27

*Nat'l Cable Television Ass'n, Inc. v. Broad. Music, Inc.*,
    772 F. Supp. 614 (D.D.C. 1991) ..............................................................10

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004)..................................................................................16

*Teleprompter Corp. v. Columbia Broad. Sys., Inc.*,
    415 U.S. 395 (1974)..................................................................................22

*Twentieth Century Fox Film Corp. v. iCraveTV*,
    Nos. 00-120, 00-121, 2000 WL 255989 (W.D. Pa. Feb. 8, 2000) ...........23

*United States v. Manning*,
    526 F.3d 611 (10th Cir. 2008) ..................................................................10

*United States v. Morgan*,
    922 F.2d 1495 (10th Cir. 1991) ................................................................10

*Warner Bros. Entm't Inc. v. WTV Sys., Inc.*,
    824 F. Supp. 2d 1003 (C.D. Cal. 2011) ............................23, 24, 25, 26

*WNET, Thirteen v. Aereo, Inc.*,
    712 F.3d 676 (2d Cir. 2013)........................................................... passim

*WNET, Thirteen v. Aereo, Inc.*,
    722 F.3d 500 (2d Cir. 2013)..............................................................4, 15

*WPIX, Inc. v. ivi, Inc.*,
    691 F.3d 275 (2d Cir. 2012)........................................23, 24, 25, 28

*WPIX, Inc. v. ivi, Inc.*,
    765 F. Supp. 2d 594 (S.D.N.Y. 2011)..................................................23, 28

**STATUTES**

17 U.S.C. § 101..................................................................................... passim

17 U.S.C. § 106 .................................................................................................2, 8, 10

17 U.S.C. § 111 .......................................................................................................24

17 U.S.C. § 119 .......................................................................................................24

17 U.S.C. § 122 .......................................................................................................24

47 U.S.C. § 325 .......................................................................................................24

47 C.F.R. § 76.64 ....................................................................................................24

OTHER AUTHORITIES

H.R. Rep. No. 94-1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659 .......................2, 10, 11, 22

Jane C. Ginsburg, *Recent Developments in US Copyright Law – Part II, Caselaw:*
  *Exclusive Rights on the Ebb?*, Columbia Pub. L. Res. Paper No. 08-192 (2008) ..............4, 18

Jane C. Ginsburg, WNET v. Aereo: *The Second Circuit Persists in Poor (Cable)Vision*
  (The Media Inst., Apr. 23, 2013) .........................................................................4, 17

Jeffrey Malkan, *The Public Performance Problem in Cartoon Network LP v. CSC*
  *Holdings, Inc.*, 89 Or. L. Rev. 505, 536, 553 (2010) ........................................4, 18

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (2012) ...................................19, 20

Paul Goldstein, *Goldstein on Copyright* (3d ed. Supp. 2012) ...................................4, 18

S. Rep. No. 102-92 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1133................................28

Plaintiffs Community Television of Utah, LLC d/b/a KSTU FOX 13 ("KSTU"), KUTV Licensee, LLC d/b/a KMYU and KUTV ("KMYU" and/or "KUTV"), and Fox Broadcasting Company ("FBC") (collectively "Plaintiffs") hereby submit their Motion for Preliminary Injunction and Memorandum in Support.

## INTRODUCTION

Aereo is a service that charges subscribers a monthly fee to watch live broadcast television over the Internet. When Aereo moves into a new city, it builds a device consisting of hundreds or thousands of dime-sized antenna loops on circuit boards connected to computer equipment, which it locates in an area that receives good broadcast reception. The Aereo device captures over-the-air broadcast signals from local television stations and creates digital copies of the broadcasts for each subscriber watching that broadcast on Aereo. Once a few seconds of copied programming have accumulated on Aereo's server, Aereo retransmits – *i.e.*, streams – the programming from these subscriber-associated copies over the Internet to its subscribers' computers, mobile devices, and televisions with Internet-connected devices (*i.e.*, Roku, AppleTV). By retransmitting broadcast television signals to subscribers, Aereo is performing the same function as cable and satellite television providers and, like cable and satellite providers, Aereo is required to obtain a license from the copyright owners to retransmit their programs to members of the public. Aereo did not obtain the required license. Aereo's conduct is copyright infringement and should be preliminarily enjoined.

Aereo launched in Utah and began capturing and retransmitting the broadcasts of local stations in the Salt Lake City area approximately six weeks ago. Aereo is currently

1

retransmitting the programming of Plaintiffs KSTU, KUTV, and KMYU including, among other things, popular Salt Lake City news programs such as KSTU's *Good Day Utah* and KUTV's *2 News*, as well as the top-rated Utah-centric sports program, *Talkin' Sports*, which is broadcast on KUTV and KMYU.  The KSTU broadcasts being retransmitted include programming in which Plaintiff FBC owns or exclusively licenses the copyrights, such as college sports programming and popular entertainment programs.

Under the Copyright Act, the copyright owner has the exclusive right to publicly perform the copyrighted work.   17 U.S.C. §§ 101, 106(4).[1]   Because retransmitting broadcast programming is a public performance, Aereo is required to obtain a license.  Unlike its cable and satellite competitors, Aereo refuses to take a license and instead helps itself to broadcast content without compensating the people whose time, money, and effort produced the programming.  Aereo is profiting from free-riding on the copyright owners' creative and financial investment.  Preventing retransmission services from free-riding on broadcast television content was one of Congress's express purposes when it enacted the 1976 revisions to the Copyright Act.  *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 709-10 (1984).

District courts in California and Washington D.C. recently issued preliminary injunctions against identical services.  *See Fox Television Stations, Inc. v. FilmOn X LLC*, --- F. Supp. 2d ---, 2013 WL 4763414 (D.D.C. 2013) (issuing preliminary injunction against service that operated identically to Aereo), *appeal docketed*, No. 13-7146 (D.C. Cir. Sept. 20, 2013) ("*FilmOnX*"); *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d

---

[1] *See also* H.R. Rep. No. 94-1476, at 63 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5676-77 (the "1976 Report") ("[A] cable television system is performing when it retransmits the broadcast to its subscribers[.]").

1138 (C.D. Cal. 2012) (also issuing a preliminary injunction against a service identical to Aereo), *appeal docketed sub nom.*, *Fox Television Stations, Inc. v. Aereokiller, LLC*, Nos. 13-55156, 13-55157 (9th Cir. Jan. 25, 2013) ("*BarryDriller*").

These decisions both held that Aereo-like services infringe the copyright owners' exclusive right to perform their copyrighted programs publicly under the statute's plain language.  Under the Copyright Act, "[t]o perform . . . a work 'publicly'" is, among other things, to "transmit or otherwise communicate a performance or display of the work . . . to the public, *by means of any device or process*, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times."  17 U.S.C. § 101 (emphasis added).  This provision is known as the Transmit Clause.  "[D]evice" and "process" are defined broadly to include any device or process "now known or later developed."  *Id*.  As both the *FilmOnX* and *BarryDriller* Courts found, services like Aereo's publicly perform copyrighted broadcast programming under the Transmit Clause by transmitting a performance (*i.e.*, an audiovisual rendering) of the programs to the public by means of a device or process (*i.e.*, capturing the signals with a miniature-antenna contraption, copying them, and then streaming them over the Internet).  *FilmOnX*, 2013 WL 4763414, at *12-15; *BarryDriller*, 915 F. Supp. 2d at 1143-46.

Aereo will request that this Court follow the contrary opinion in *WNET, Thirteen v. Aereo, Inc*., 712 F.3d 676 (2d Cir. 2013) ("*WNET*").  That case, however, is an outlier with a split panel and strongly-worded dissent.  Moreover, the *WNET* decision came out the way it did because the court there was constrained to follow an earlier, much-criticized Second Circuit decision, *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008)

("*Cablevision*").  In *Cablevision*, the Second Circuit effectively rewrote the Transmit Clause so that, in the Second Circuit, a copyright owner no longer has the exclusive right to transmit a performance of the work to the public by means of "any device or process," as the statute provides.  Instead, under *Cablevision*'s interpretation of the statute, the copyright owner only has the exclusive right to transmit a performance of the work to the public using a device or process that meets certain specifications.  The necessary specifications are that (1) the device or process must deliver the performance to members of the public simultaneously via a single transmission, or (2) the device or process must deliver the performance to members of the public via transmissions generated from a single master copy of the work.  *Id*. at 134-40.  If the device or process delivers the performance to the public by first creating user-associated digital copies of the works and then transmitting from those copies, then this falls outside the exclusive public performance right, meaning anyone is free to use such a system to publicly perform the work without compensating the copyright owner.  Courts and scholars agree that *Cablevision*'s reading of the statute was incorrect.[2]

---

[2] *See, e.g.*, *FilmOnX*, 2013 WL 4763414, at *13-14 & nn.11-12 (agreeing that *Cablevision* misread the statute and enjoining Aereo-like service); *BarryDriller*, 915 F. Supp. 2d at 1143-46 (same); 2 Paul Goldstein, *Goldstein on Copyright* § 7.7.2, at 7:168 (3d ed. Supp. 2012) ("Goldstein"); Jane C. Ginsburg, *Recent Developments in US Copyright Law – Part II, Caselaw: Exclusive Rights on the Ebb?*, 26, Columbia Pub. L. Res. Paper No. 08-192 (2008) ("Ginsburg, *Recent Developments*"); Jane C. Ginsburg, WNET v. Aereo: *The Second Circuit Persists in Poor (Cable)Vision* (The Media Inst., Apr. 23, 2013) ("Ginsburg, *Poor (Cable)Vision*"); Jeffrey Malkan, *The Public Performance Problem in Cartoon Network LP v. CSC Holdings, Inc.*, 89 Or. L. Rev. 505, 536, 553 (2010) ("Malkan"); *see also WNET, Thirteen v. Aereo, Inc.*, 722 F.3d 500, 507 n.13 (2d Cir. 2013) (Chin, J., dissenting from denial of rehearing en banc) (citing additional commentary criticizing *Cablevision*).  For the Court's convenience, Plaintiffs have included the articles on which they rely in an Appendix to this brief.

Aereo built its complicated, inefficient retransmission device involving thousands of antenna loops and digital copies to take advantage of *Cablevision*'s misreading of the statute. Recognizing that it was on questionable legal ground, Aereo initially limited its service to the Second Circuit so that if it were sued *Cablevision* would be controlling.  *See WNET*, 712 F.3d at 697, 703 (Chin, J. dissenting) (referring to Aereo's system as a "Rube Goldberg-like contrivance, over-engineered in an attempt to avoid the reach of the Copyright Act and to take advantage of a perceived loophole in the law" and noting "it is telling that Aereo declines to offer its subscribers channels broadcast from New Jersey, even though its antennas are capable of receiving those signals, for fear of being subject to suit outside the Second Circuit, *i.e.*, outside the reach of *Cablevision*").  Now that Aereo has expanded its service to Utah, Plaintiffs ask the Court to follow the *FilmOnX* and *BarryDriller* cases and enjoin Aereo from retransmitting their copyrighted programming.

## STATEMENT OF FACTS

Plaintiffs own or are exclusive licensees in the copyrights to numerous programs being retransmitted without authorization by Aereo.  The copyrighted programs include local news and sports programming, as well as programs in which FBC owns or exclusively licenses the copyrights.  Declaration of Tim Ermish ¶¶ 4-6, 8-11 ("Ermish Decl."); Declaration of Kent Crawford ¶¶ 3-6 ("Crawford Decl."); Declaration of Dan Harrison ¶¶ 2-5 ("Harrison Decl."); Declaration of Larry Jones ¶¶ 1-2, 5 ("Jones Decl.").

Aereo captures live television broadcasts from the airwaves and retransmits them over the Internet to consumers who subscribe to Aereo's service.  After subscribing and paying the monthly fee, the subscriber simply logs onto Aereo, and clicks the "Guide" button to view an on-

screen program guide which, like the program guides offered by cable and satellite systems, shows available channels and the programs currently airing.  This screenshot shows the program guide Aereo provides to Utah subscribers, which includes Plaintiffs' broadcasts, with a KSTU broadcast selected:



Declaration of Julie Shepard ¶¶ 4-9 and Ex. G ("Shepard Decl.").

If the subscriber clicks on a program from the guide and selects "Watch," Aereo streams the program over the Internet to her computer or mobile device and it plays on her screen, as if she were watching a television:



*Id.* ¶¶ 8-9 and Exs. H-I; *see also id.* Exs. A-F.  Further, Aereo subscribers are not limited to watching live broadcast television via Aereo on portable devices.  They can watch live broadcast programming via Aereo on their televisions by using an Internet-connected device (*i.e.,* AppleTV or Roku).  *See id.* Ex. A.

### PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION

## I.      Standard For Granting A Preliminary Injunction

Under the traditional four-prong test for a preliminary injunction,  the party moving for an injunction must show: (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm to the movant; (3) the harm alleged by the movant outweighs any harm to the non-moving party; and (4) an injunction is in the public interest.  *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013) (en banc).  Plaintiffs' action satisfies all four prongs.

## II.   Plaintiffs Are Likely To Succeed On The Merits

To establish copyright infringement, a plaintiff must show (1) ownership of a valid copyright and (2) violation by the defendant of any of one of the five exclusive rights granted to copyright owners under 17 U.S.C. § 106.  *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 831-32 & n.6 (10th Cir. 1993).  Plaintiffs are the copyright owners or exclusive licensees of numerous programs that Aereo is unlawfully streaming to the public.  *See* Ermish Decl. ¶¶ 6-8; Crawford Decl. ¶¶ 5, 7; Harrison Decl. ¶¶ 2-5; Jones Decl. ¶¶ 2-5.  And as explained below, Aereo is violating Plaintiffs' exclusive right to perform their copyrighted works publicly and to authorize others to do so.  *See* 17 U.S.C. § 106(4).

### A.   Aereo Publicly Performs Plaintiffs' Copyrighted Works.

The Copyright Act grants copyright owners the exclusive right to perform their copyrighted works publicly.  17 U.S.C. § 106(4).  Section 101 of the Act defines what it means to perform a work "publicly."  The part of this definition that relates to transmitted performances (as opposed to in-person performances like live plays) is called the "Transmit Clause."  Under the Transmit Clause, "[t]o perform . . . a work 'publicly'" is:

> to transmit or otherwise communicate a performance or display of the work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

*Id.* § 101.

A television program is performed when its images and sounds are played.  17 U.S.C. § 101 (definition of "perform" an "audiovisual work").  To "'transmit' a performance" is to "communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent."  *Id.* (definition of "transmit").  And a "device" or "process"

includes "one now known or later developed."  *Id.* (definition of "'device,' 'machine,' or 'process'").

Aereo publicly performs Plaintiffs' programs within the plain language of the statute. For example, when KSTU airs a broadcast of *Fox College Saturday*, Aereo ***transmits*** (communicates from mini-antennas through servers over the Internet to subscribers) ***a performance*** (an audiovisual rendering) ***of the work*** (the program) ***to the public*** (Aereo subscribers).[3]  The performance is transmitted via a "***device or process***," namely Aereo's system of antenna loops and computer equipment, digital copies, and the Internet.  The Aereo subscribers capable of receiving the performance can receive it in separate places and at different times, *i.e.*, in their separate homes, on their personal computers, mobile devices, or televisions.

Indeed, this is precisely what the *FilmOnX* and *BarryDriller* Courts concluded when they held that the copyright owners in those cases were likely to prevail on the merits of their identical copyright-infringement claims.  *FilmOnX*, 2013 WL 4763414, at *13 (holding that "the provisions of the 1976 [Copyright] Act are clear" and that a service identical to Aereo's "violates Plaintiffs' exclusive right . . . to perform the copyrighted work publicly") (internal quotation marks omitted); *BarryDriller*, 915 F. Supp. 2d at 1144 ("The definition section sets forth what constitutes a public performance of a copyrighted *work*, and says that transmitting a performance to the public is a public performance.").

---

[3] Subscribers to a retransmission service fall within the definition of "the public."  *See* 1976 Report at 64-65 ("Under the bill, as under the present law, a performance made available by transmission to the public at large is 'public' even though the recipients are not gathered in a single place, and even if there is no proof that any of the potential recipients was operating his receiving apparatus at the time of the transmission.  The same principles apply whenever the potential recipients of the transmission represent a limited segment of the public, such as the occupants of hotel rooms *or the subscribers of a cable television service*.") (emphasis added).

Because the statutory language is clear, the inquiry should end here.  *United States v. Manning*, 526 F.3d 611, 614 (10th Cir. 2008) ("We begin by examining the statute's plain language.  If the statutory language is clear, our analysis ordinarily ends.") (citing *United States v. Morgan*, 922 F.2d 1495, 1496 (10th Cir. 1991)).   However, even assuming there were any ambiguity, the legislative history confirms that Congress intended the Transmit Clause to apply to all conceivable technologies and combinations of technologies:

> The definition of "transmit" . . . is broad enough to include *all conceivable forms and combinations of wires and wireless communications media*, including but by no means limited to radio and television broadcasting as we know them.  Each and every method by which the images or sounds comprising a performance or display are picked up and conveyed is a "transmission," and *if the transmission reaches the public in [any] form*, the case comes within the scope of [the statute].

1976 Report at 64 (emphasis added); *id*. at 63 (a "performance may be accomplished 'either directly or by means of any device or process,' including all kinds of equipment for reproducing or amplifying sounds or visual images, any sort of transmitting apparatus, any type of electronic retrieval system, and any other techniques *and systems not yet in use or even invented*") (emphasis added); *see also FilmOnX*, 2013 WL 4763414 at *14 ("[T]he legislative history confirms Congress's intent that the Transmit Clause and § 106(4) be applied broadly."); *Nat'l Cable Television Ass'n, Inc. v. Broad. Music, Inc.*, 772 F. Supp. 614, 651 (D.D.C. 1991)  ("the term 'public performance' was meant to be read broadly" and "it would strain logic to conclude that Congress would have intended the degree of copyright protection to turn on the mere method by which television signals are transmitted to the public") (internal quotation marks and citation omitted).

10

Moreover, the legislative history makes clear that Congress intended to include retransmission of broadcast television programming within the definition of public performance. *See, e.g.*, 1976 Report at 63 ("[A] cable television system is performing when it retransmits the broadcast to its subscribers[.]"); *id.* at 88-89 ("[C]able systems are commercial enterprises whose basic retransmission operations are based on the carriage of copyrighted program material and . . . copyright royalties should be paid by cable operators to the creators of such programs."); *see also Capital Cities Cable*, 467 U.S. at 709-10 ("Prior to the 1976 revision, the [Supreme] Court had determined that the retransmission of distant broadcast signals by cable systems did not subject cable operators to copyright infringement liability because such retransmissions were not 'performances' within the meaning of the 1909 Act.  In revising the Copyright Act, however, Congress concluded that cable operators should be required to pay royalties to the owners of copyrighted programs retransmitted by their systems on pain of liability for copyright infringement.") (internal citations omitted).

**B.    The Court Should Reject Any Attempt By Aereo To Rely On The Second Circuit's Misreading Of The Transmit Clause.**

### 1.    *Cablevision* **And** *Aereo.*

In *Cablevision*, the Second Circuit interpreted the Transmit Clause to mean that a public performance *only* occurs if the transmitter uses a specific type of device or process, namely one that involves a single transmission being delivered to multiple people simultaneously or one that involves multiple transmissions generated from the same master copy of the work.  536 F.3d at 134-40.  *Cablevision* did not involve an unlicensed retransmission service like Aereo.  Instead, it involved a licensed cable company's remote-storage DVR ("RS-DVR").  The RS-DVR operated in all practical respects like a regular DVR, except that the recorded programs were stored on a

11

remote server instead of a set-top box.  *Id.* at 124-25.  When a subscriber used her remote control to play back a program, the program would be transmitted from the remote server to her television.  *Id.*  One issue in *Cablevision* was whether these playback transmissions were a public performance.  *Id.* at 134.  The *Cablevision* Court held that they were not.  *Id.* at 136-40.

The reason *Cablevision* has been so widely criticized was not the ultimate result (approving remote DVRs), but rather the method by which that result was reached.   The *Cablevision* Court decided that when Congress wrote "members of the public capable of receiving the *performance*" in the Transmit Clause, what it really meant was "members of the public capable of receiving the *transmission*."   536 F.3d at 134.   Thus, the Second Circuit rewrote the statute as follows:

> to transmit or otherwise communicate a performance or display of the work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the ~~performance~~ **transmission** or display receive ~~it~~ **the transmission** in the same place or in separate places and at the same time or at different times.

The *Cablevision* Court justified rewriting the statute by reasoning that "[t]he fact that the statute says 'capable of receiving the performance' instead of 'capable of receiving the transmission' underscores the fact that the transmission of a performance is itself a performance."   *Id.*   In actuality, the fact that the statute says "performance" instead of "transmission" tells us that Congress meant "performance" not "transmission." Based on its revision of the statute, the Court wrongly decided that – instead of examining whether the transmitter is transmitting a performance of the work "to the public," 17 U.S.C. § 101 – the Transmit Clause "directs us to examine precisely who is 'capable of receiving' a particular

12

transmission of a performance." *Id*. at 135.  Under this reasoning, a service could avoid a public performance by transmitting a copyrighted program to thousands or millions of subscribers by sending an individual transmission to each subscriber – a result obviously inconsistent with the statute's reference to transmissions of a performance being received "in separate places" or "at different times."  *See id*.

To make its interpretation of the statute consistent with cases in other circuits holding that a public performance can consist of individual transmissions, the *Cablevision* Court read into the Transmit Clause a rule that a performance consisting of individualized transmissions could count as public but *only if* the transmissions emanated from a single master copy of the work.  536 F.3d at 138.  Based on this interpretation of the Transmit Clause, the Court held that "[b]ecause each RS-DVR playback transmission is made to a single subscriber using a single unique copy produced by that subscriber," there was no public performance.  *Id*. at 139.

In *WNET*, the Second Circuit was presented with the question of whether to apply *Cablevision*'s interpretation of the Transmit Clause to Aereo's Internet retransmission service. The *WNET* majority held that it had no choice, explaining that "we do not work from a blank slate.  Rather, this Court in *Cablevision* . . . closely analyzed and construed the Transmit Clause

in a similar factual context."   712 F.3d at 686.[4]   The majority concluded that *Cablevision*

established a series of convoluted "guideposts" for courts within the Second Circuit to determine

whether a particular device or process makes public or private performances:

> First and most important, the Transmit Clause directs courts to
> consider the potential audience of the individual transmission.  If
> that transmission is "capable of being received by the public" the
> transmission is a public performance; if the potential audience of
> the transmission is only one subscriber, the transmission is not a
> public performance, except as discussed below.   Second and
> following from the first, private transmissions – that is those not
> capable of being received by the public – should not be aggregated.
> It is therefore irrelevant to the Transmit Clause analysis whether
> the public is capable of receiving the same underlying work or
> original performance of the work by means of many transmissions.
> Third, there is an exception to this no-aggregation rule when
> private transmissions are generated from the same copy of the
> work.   In such cases, these private transmissions *should* be
> aggregated, and if these aggregated transmissions from a single
> copy enable the public to view that copy, the transmissions are
> public performances.  Fourth and finally, "any factor that limits the
> *potential* audience of a transmission is relevant" to the Transmit
> Clause analysis.

*Id*. at 689 (internal citations omitted).

These "guideposts" are not in the statute and, in fact, are completely antithetical to the

language and purpose of the statute, which explicitly covers any "device" or "process" that is

---

[4] Likewise, the district court's order denying the preliminary injunction repeatedly suggested that
the court would have reached the opposite conclusion if *Cablevision* had not been controlling.
*E.g.*, *Am. Broad. Cos., Inc. v. Aereo, Inc.*, 874 F. Supp. 2d 373, 375 (S.D.N.Y. 2012) ("But for
*Cablevision*'s express holding regarding the meaning of the provision of the Copyright Act in
issue here – the transmit clause – Plaintiffs would likely prevail on their request for a preliminary
injunction."); *id*. at 385 ("[T]his Court finds itself constrained to reject the approach Plaintiffs
urge."); *id*. at 388 ("[T]his Court remains obligated to apply Circuit precedent with fidelity to its
underlying reasoning."); *id*. at 393 ("[A]lthough the text of the transmit clause suggests that
Congress intended that clause's coverage to sweep broadly . . . ."); *see also FilmOnX*, 2013 WL
4763414, at *6 (describing the district court opinion).

"now known or later developed."  17 U.S.C. § 101.  Nonetheless, the *WNET* majority applied

them to Aereo, and affirmed the district court's denial of a preliminary injunction.  712 F.3d at

689-90.  The Court implicitly acknowledged that the *Cablevision* "guideposts" were illogical,

noting at the end of its analysis that "[p]erhaps the application of the Transmit Clause should

focus less on the technical details of a particular system and more on its functionality, but this

Court's decisions . . . held that technical architecture matters."  *Id*. at 694.  In his dissent, Judge

Chin pointed out that "[i]t is apparent that Aereo's system falls squarely within the plain

meaning of the statute.  The statute is broadly worded, as it refers to '*any* device or process.'"

*Id*. at 698 (internal citation omitted).    Judge Chin wrote an even more detailed and

comprehensive analysis of why the Second Circuit's interpretation of the Transmit Clause was

erroneous in his dissent to the Court's order denying en banc review, which was joined by Judge

Wesley.  *See WNET*, 722 F.3d at 504-11.

> **2.      The Flaws In The Second Circuit's Interpretation Of The Transmit Clause.**

Aside from being facially inconsistent with the plain language of the Transmit Clause, the

*Cablevision/WNET* "guideposts" were arrived at through an analysis that is at odds with well-

settled rules of statutory interpretation and further undermined by faulty reasoning.

> **a.      The *Cablevision* Court Confused The Terms "Performance" And "Transmission."**

The *Cablevision* Court should not have replaced the word "performance" with the word

"transmission."  "Perform" and "transmit" are defined in the statute, and they are not synonyms.

To "perform" an audiovisual work is to "show its images in any sequence or to make the sounds

accompanying it audible."  17 U.S.C. § 101.  To "'transmit' a performance" is to "communicate

it by any device or process whereby images or sounds are received beyond the place from which

they are sent." *Id*.  Thus, the "performance" (*i.e.*, the audiovisual rendering of the program that viewers see and hear) is *the thing that is communicated* and the transmission is *the means of communicating it*.  If Congress had meant to write "capable of receiving the transmission" instead of "capable of receiving the performance" it would have done so.  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("the usual rule" is that "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended"); *Case v. Hatch*, --- F.3d ---, 2013 WL 1501521, at *17 (10th Cir. 2013) (same).

By replacing "performance" with "transmission" the Second Circuit materially changed the statute.  One can "transmit . . . a performance . . . of the work . . . to the public" in two ways.  One way is to transmit it via a one-to-many system, like a television broadcast.  The other way is to transmit a performance to members of the public via one-to-one transmissions, like video-on-demand (or by using one of Aereo's contraptions).  Congress wrote the statute to ensure that the copyright owner had the exclusive right to transmit to the public *using either method*.  The Second Circuit changed the statute to say that the exclusive right *only* extends to one-to-many transmissions, leaving third parties free to exploit copyrighted television programs and movies without authorization so long as they use one-to-one transmission systems.   There was no basis in the statute or legislative history for doing this.  *See BarryDriller*, 915 F. Supp. 2d at 1144 ("The statute provides an exclusive right to transmit a performance publicly, but does not by its express terms require that two members of the public receive the performance from the same transmission."); *FilmOnX*, 2013 WL 4763414, at *14 n.12 (agreeing that "*Cablevision* and *Aereo* mistakenly substituted 'transmission' for 'performance'" and explaining that "[w]hen the

analysis shifts to whether FilmOnX permits multiple persons to watch a single performance . . . it is immediately clear that the artifice of one-to-one is baldly wrong").

Moreover, the language of the statute shows that Congress understood that a transmitter could perform a work by sending individual transmissions to members of the public, and expressly included such transmissions within the statute by providing that a performance is public "whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times."  17 U.S.C. § 101.  Two people cannot receive the *same* transmission of a performance "at different times."[5]  The plain text of the statute therefore conclusively refutes the Second Circuit's reading, as Congress *explicitly rejected* the notion that the Transmit Clause could be evaded through the simple expedient of making multiple individual transmissions.   Moreover, because people receiving transmissions at different times are *necessarily* receiving *separate* transmissions, the *Cablevision/WNET* interpretation reads the "different times" language out of the statute.  This is because under the *Cablevision/WNET* interpretation, any performance that was transmitted to members of the public at "different times" would be private, since it necessarily would involve individualized transmissions.   Reading out statutory language as the *Cablevision* Court did violates one of the most basic rules of statutory construction.  *Corley v. United States*, 556 U.S. 303, 314 (2009) ("[O]ne of the most basic interpretive canons [is] that a statute should be

---

[5] *See* Ginsburg, *Poor (Cable)Vision*, *supra* (explaining that "at different places and different times" is "the key language that should make clear that Congress was covering both simultaneous, and 'asynchronous' transmissions," and that "the Second Circuit's reading effectively deletes 'different times' from the statute, thus defeating Congress's clear intent to bring pay-per-view and other individualized forms of transmission within the scope of the Copyright Act").

construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.") (internal quotation marks and alterations omitted).

Scholars agree that improperly substituting "transmission" for "performance" was the critical error in *Cablevision*. *E.g.*, Goldstein, *supra*, at 7:168 ("The error in the Second Circuit's construction of the transmit clause was to treat 'transmissions' and 'performance' as synonymous, where the Act clearly treats them as distinct – and different – operative terms."); Ginsburg, *Recent Developments*, *supra*, at 26 ("[T]he court confused 'performance' and 'transmission.'"); Malkan, *supra*, at 536 (the court "thought that the words 'performance' and 'transmission' were interchangeable . . . [but] a transmission and a performance remain, technically and legally, two distinct things"); *id.* at 553 ("The principal error in the court's application of the transmit clause was that it substituted the word 'transmission' for the word 'performance' in the phrase 'capable of receiving the performance[.]'").

      **b.**      **Determining Whether A Performance Is Public Based On Whether The Transmissions Emanate From A Master Copy Is Illogical And Not Consistent With The Statute's Plain Language.**

The Second Circuit's reading of the Transmit Clause conflicted with the statutory text and case law. *E.g.*, *WNET*, 712 F.3d at 689 n.11; *Cablevision*, 536 F.3d at 137. To address this conflict, the Second Circuit further distorted the Transmit Clause by reading into it a rule that individual "private" transmissions to members of the public can be "aggregated" and treated collectively as a public performance so long as they emanate from a single master copy of the work. *E.g.*, *WNET*, 712 F.2d 688-89 & n.11; *Cablevision*, 536 F.3d at 137-38. This idea originated with the Nimmer Copyright treatise, and even the *Cablevision* Court admitted that

Professor Nimmer did not explain "*why* the use of a distinct copy affects the transmit clause inquiry." 536 F.3d at 138 (emphasis in original).

The obvious problem with the Second Circuit's approach was that the Transmit Clause does not say anything about "copies" or "aggregation" – it says "any *device or process.*" 17 U.S.C. § 101. Nothing in the legislative history suggests Congress intended to limit the definition of public performance to instances where the performance was transmitted to members of the public from the same copy. Rather, copyright law protects *the copyrighted work*, not any particular copy of that work. A copy is just a material object, like a DVD or computer file, in which the copyrighted program is fixed. *BarryDriller*, 915 F. Supp. 2d at 1144 ("[T]he concern [under the Copyright Act] is with the performance of the copyrighted work, *irrespective of which copy of the work the transmission is made from.*") (emphasis added); *see also FilmOnX*, 2013 WL 4763414 at *14. Moreover, in attempting to justify its atextual interpretation of the statute by preserving a public performance right for individualized transmissions "at different times," but only from a master copy, the *Cablevision* Court failed to square this rationalization with its earlier foundational premise that a public performance must be determined by examining who is "capable of receiving the transmission." Finally, the Nimmer treatise, which cites no statutory language or legislative history supporting the author's view, *see generally* 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.14[C][3], at 8-142 (2012), cannot override the plain language of the statute and Congress's express intent that it should be a public performance to transmit a performance to members of the public using *any device or process*.

Moreover, the illustration provided by the Nimmer treatise itself demonstrates why deciding whether a performance is public or private based on whether its source is individual

copies or a master copy produces absurd results that are contrary to the statute. The treatise hypothesizes that under this reading of the Transmit Clause, a person who rents and watches a movie from a video store is publicly performing the movie because other people rented and watched that same copy. *Nimmer on Copyright* § 8.14[C][3]. But this cannot be right, because a video-store rental does not involve a transmission, so the Transmit Clause is not implicated by Professor Nimmer's example. A person sitting in his living room watching a DVD of *Braveheart* that he rented from Blockbuster is *not* publicly performing *Braveheart*, because he is neither playing the DVD at a place open to the public nor transmitting *Braveheart* to members of the public, as the statute requires. *See* 17 U.S.C. § 101. Under Professor Nimmer's analysis, four people who happened to rent the same DVD copy of *Braveheart* from Blockbuster would each be liable for publicly performing *Braveheart* by virtue of the fact that they all watched the same copy. Yet Aereo could retransmit a broadcast of the Super Bowl to 50,000 subscribers without a license, and this would be deemed to be just 50,000 "private" performances of the Super Bowl. This result makes no logical sense. Whether a performance is public depends on whether the transmitter is transmitting a performance (*i.e.*, an audiovisual rendering of copyrighted work) *to the public*. It does not depend on whether the *source* of the transmissions is one copy or many copies of the underlying work. *See BarryDriller*, 915 F. Supp. 2d at 1144; *FilmOnX*, 2013 WL 4763414, at *11-14.

      c.    **The *Cablevision* And *WNET* Courts Incorrectly Found That The Plain Language Of The Statute Would Cause Private Performances To Be Infringing.**

The *Cablevision* and *WNET* Courts apparently believed that if the definition of public performance was not limited to situations where a single transmission was sent to multiple

people, there would be no possibility of a private performance and "a hapless customer who records a program in his den and later transmits the recording to a television in his bedroom would be liable for publicly performing the work simply because some other party had once transmitted the same underlying performance to the public." *Cablevision*, 536 F.3d at 136; *see also WNET*, 712 F.3d at 687-88.  This is illogical.

Contrary to the *Cablevision* Court's example, the "hapless customer" has not publicly performed the program because he did not transmit it to the public, which is what the Transmit Clause requires.  *See* 17 U.S.C. § 101 (to perform a work publicly is to "transmit or otherwise communicate a performance . . . of the work *to the public*") (emphasis added).  Rather, the "hapless customer" merely transmitted the program to himself in his bedroom, which is not a public performance.  *See BarryDriller*, 915 F. Supp. 2d at 1145 & n.12 (addressing Cablevision's "hapless customer" hypothetical and recognizing "[t]here is nothing public about such a performance").[6]

### 3.    It Is Not A Defense For Aereo To Say That It Just Allows Consumers To Access And Record Over-The-Air Broadcasts.

Aereo will undoubtedly argue that its Internet retransmission system cannot be infringing because it merely allows consumers to do something they could legally do for themselves, namely receive broadcast television using an antenna.  This argument is simply a rehash of the argument cable companies used in the 1960s and 1970s to avoid paying license fees when they retransmitted broadcast programming over cable systems.  Congress expressly rejected this

---

[6] This is consistent with the Copyright Act's "public place" clause, which states that a performance is public when the audience is not limited to the performer's family and friends. *See* 17 U.S.C. § 101.

argument when it revised the 1976 Copyright Act.  Before the 1976 revision, the Supreme Court

held in a pair of cases that early cable systems (which were then called community antenna or

"CATV" systems) were not subject to public-performance liability under the 1909 Copyright Act

because they merely allowed viewers to do what they could do on their own, *i.e.*, receive

broadcast television signals with an antenna. *Fortnightly Corp. v. United Artists Television, Inc.*,

392 U.S. 390, 399-400 (1968) ("Essentially, a CATV system no more than enhances the viewer's

capacity to receive the broadcaster's signals" and "the basic function the equipment serves is

little different from that served by the equipment generally furnished by a television viewer.  If

an individual erected an antenna on a hill, strung a cable to his house, and installed the necessary

amplifying equipment, he would not be 'performing' the programs he received on his television

set"); *Teleprompter Corp. v. Columbia Broad. Sys., Inc.*, 415 U.S. 395, 408 (1974) ("[t]he

privilege of receiving the broadcast electronic signals and of converting them into the sights and

sounds of the program inheres in all members of the public who have the means of doing so.

[Thus,] [t]he reception and rechanneling of [broadcast television] signals for simultaneous

viewing is essentially a viewer function" not subject to copyright liability.).

In enacting the Transmit Clause as part of the 1976 Copyright Act, Congress rejected that

equivalency, reasoning that unlike individual viewers, "'cable systems are commercial

enterprises whose basic retransmission operations are based on the carriage of copyrighted

program material and . . . copyright royalties should be paid by cable operators to the creators of

such programs.'"  *BarryDrille*r, 915 F. Supp. 2d at 1146 (quoting 1976 Report at 88-89; *see also*

1976 Report at 87-88 (explaining the congressional intent to overrule *Fortnightly* and

*Teleprompter*).  Accordingly, Congress determined that retransmission services publicly perform

22

copyrighted programming and therefore must be licensed. *See Capital Cities Cable*, 467 U.S. at 709-10.

In sum, Congress recognized a difference between what people can legally do on their own, and what a commercial service provider can legally do for its customers. Thus, under the statute, it is not infringement for a consumer to watch a broadcast television program with an antenna at home, yet it is infringement for a service provider to transmit that same program "to the public" by means of "any device or process" without a license. *See* 17 U.S.C. § 101. Whether the device or process the service provider uses to transmit the program involves the same underlying technology as in-home consumer products is not relevant to the infringement analysis. *See id.* ("any device or process"); *cf. L.A. News Serv. v. Tullo*, 973 F.2d 791, 797 (9th Cir. 1992) (holding that even though a consumer can use VCR technology to record shows and watch them later, "a [VCR] owner who tapes the movie to sell copies to others without the copyright owner's consent is subject to a range of civil and criminal sanctions").

## III.   Plaintiffs Will Suffer Irreparable Harm Absent An Injunction

Every court that has considered the question of whether unauthorized Internet streaming of television and other video programming causes irreparable harm to the copyright owners has concluded unequivocally that it does. *See FilmOnX*, 2013 WL 4763414, at *15-17; *BarryDriller*, 915 F. Supp. 2d at 1147; *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 617-20 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 275 (2d Cir. 2012); *CBS Broad. Inc. v. FilmOn.com*, No. 10-7532, Dkt. No. 8 (S.D.N.Y. Nov. 22, 2010); *Twentieth Century Fox Film Corp. v. iCraveTV*, Nos. 00-120, 00-121, 2000 WL 255989, at *8 (W.D. Pa. Feb. 8, 2000); *accord Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1012-13 (C.D. Cal. 2011). In fact, even the district court in New

York that declined to enjoin Aereo found, specifically, that Aereo's continued operation would irreparably harm the copyright owners of the programs streamed over Aereo's service. *Am. Broad. Cos.*, 874 F. Supp. 2d at 396-400.

Irreparable harm is established where an infringing defendant's activities threaten to impair a copyright owner's control over its copyrighted works, threaten the goodwill and business reputation of the plaintiff, or threaten to cause loss of business or business opportunities. *See, e.g.*, *FilmOnX*, 2013 WL 4763414, at *15-16; *BarryDriller*, 915 F. Supp. 2d at 1147; *ivi*, 691 F.3d at 285-87; *WTV Sys.*, 824 F. Supp. 2d at 1012-13. Aereo threatens to harm Plaintiffs in each of these ways.

One of the most important sources of revenue for local broadcast stations is the retransmission consent fees that cable and satellite companies pay to retransmit local broadcast signals.[7]  Aereo's unauthorized streaming of copyrighted television programming over the Internet, if left unabated, will impede Plaintiffs' ability to negotiate retransmission consent agreements with cable, satellite, and telecommunications providers, who legitimately retransmit the copyrighted broadcasts. Ermish Decl. ¶¶ 9, 19-20; Crawford Decl. ¶¶ 8, 10-11. If Aereo is permitted to remain on the market while paying nothing for Plaintiffs' content, this will significantly reduce the amount other distributors will be willing to pay. Ermish Decl. ¶¶ 19-20; Crawford Decl. ¶¶ 10-11; Harrison Decl. ¶¶ 8-11. Indeed, Charlie Ergen, Chairman of Dish Network (the second largest satellite TV provider in the United States) has already noted the

---

[7] Cable companies can claim a compulsory copyright license under 17 U.S.C. § 111, and satellite companies under 17 U.S.C. §§ 119 and 122, but both must abide by Federal Communications Commission rules, which generally require them to obtain broadcasters' consent before retransmitting a broadcast signal. *See* 47 U.S.C. § 325(b); 47 C.F.R. § 76.64.

leverage that Aereo provides to Dish in its retransmission consent negotiations during a recent call with Dish investors.  Shepard Decl. Ex. O (article quoting Ergen as saying that "obviously, we indirectly get a benefit [from Aereo] because it's going to put some downward pressure on retransmission consent fees").  Numerous courts have found this precise harm to be irreparable. *BarryDriller*, 915 F. Supp. 2d at 1147 ("if Defendants can transmit Plaintiffs' content without paying a fee, Plaintiffs' existing and prospective licensees will demand concessions to make up the loss of viewership to non-paying alternatives" and may move "away from license-fee paying technologies and toward free technologies" like Aereo); *see also FilmOnX*, 2013 WL 4763414, at *15; *ivi*, 691 F.3d at 285.  Moreover, "[t]he availability of Plaintiffs' content from sources other than Plaintiffs also damages Plaintiffs' goodwill with their licensees." *BarryDriller*, 915 F. Supp. 2d at 1147; Harrison Decl. ¶¶ 8-11; *see also* Jones Decl. ¶¶ 7-9; 15-18.

Aereo also threatens to interfere with Plaintiffs' ability to develop a lawful market for Internet distribution of television programming.  FBC, for example, licenses content to Hulu for distribution online over Hulu.com, and to Apple for distribution through iTunes.  Harrison Decl. ¶ 9.  The local stations also make their local programming available to viewers over the Internet. Ermish Decl. ¶¶ 22-26; Crawford Decl. ¶¶ 13-21.  Aereo competes directly with these online offerings, thereby threatening to damage Plaintiffs' goodwill with Internet distribution licensees and to undermine their decisions about how and when to show their programming on the Internet and their substantial investments in the development of this emerging market.  *BarryDriller*, 915 F. Supp. 2d at 1147; *WTV Sys.*, 824 F. Supp. 2d at 1014; *ivi*, 691 F.3d at 285-86.

Aereo also threatens to undermine Plaintiffs' positions in negotiations with advertisers by diverting viewers from distribution channels measured by Nielsen ratings, which are by far the

most significant viewership measurements relied upon by advertisers in determining what to pay. Ermish Decl. ¶¶ 20, 30; Crawford Decl. ¶¶ 22-23; Harrison Decl. ¶¶ 12-17; Jones Decl. ¶¶ 11-14. Nielsen does not measure Aereo viewership.  *Id*.  Given the significance of advertising to network and local station business models, this harm is irreparable.  *Am. Broad. Cos.*, 874 F. Supp. 2d at 397-98; *see also BarryDriller*, 915 F. Supp. 2d at 1147; *FilmOnX*, 2013 WL 4763414, at *15.

Aereo also will damage the local broadcasters' relationships with entities with whom they do business, including the licensors of popular syndicated programs whose contracts with the local station plaintiffs often include limitations on how and when certain programs or clips can be streamed over the Internet.  By immediately retransmitting all content broadcast by the local stations on the Internet, Aereo could place the stations in breach of these agreements and make it more expensive (or even impossible) for the local stations to obtain these rights in the future. Ermish Decl. ¶¶ 27; Crawford Decl. ¶¶ 9, 11-12.

Finally, once digital copies of FBC's programs are available and released on the Internet, vast viral infringement routinely follows.  For this reason, when FBC licenses broadcasts for digital distribution it contractually requires distributors to adopt security measures to prevent piracy.  Plaintiffs also impose quality control measures to assure the quality of the viewing experience.  *See* Ermish Decl. ¶ 17; Crawford Decl. ¶¶ 8-9; Harrison Decl. ¶ 18; Jones Decl. ¶¶ 7-10.  By contrast, Plaintiffs have no ability to ensure that Aereo or those who copy network programming from Aereo are doing anything to prevent further piracy or to assure the quality of retransmissions.  *See FilmOnX*, 2013 WL 4763414 at *15*; WTV Sys.*, 824 F. Supp. 2d at 1013-14.

**IV.**  **The Balance Of Harms Tips Decidedly In Favor Of An Injunction**

The harm that will befall an infringer if his infringement is enjoined is not a factor in determining whether to issue an injunction. *Autoskill Inc. v. Nat'l Educ. Support Sys., Inc*., 994 F.2d 1476, 1498-99 (10th Cir. 1993) (approving the view that "the potential injury to an allegedly infringing party caused by an injunction merits little equitable consideration and is insufficient to outweigh the continued wrongful infringement") (internal quotation marks omitted), *overruled in part on other grounds by TW Telecom Holdings Inc. v. Carolina Internet Ltd*., 661 F.3d 495 (10th Cir. 2011); *Medias & Co., Inc. v. Ty, Inc*., 106 F. Supp. 2d 1132, 1140 (D. Colo. 2000) ("The potential injury to an allegedly infringing party caused by an injunction merits little equitable consideration and is insufficient to outweigh the continued wrongful infringement."); *accord Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 829-30 (9th Cir. 1997) ("In this circuit, as well as in other circuits, a defendant who knowingly infringes another's copyright 'cannot complain of the harm that will befall it when properly forced to desist from its infringing activities.'") (citation omitted).  Because a copyright infringer's complaint that ceasing its infringing conduct will harm its business is insufficient to defeat a request for a preliminary injunction, and because Aereo's business is built upon copyright infringement, the harms tip decidedly in Plaintiffs' favor.  *FilmOnX*, 2013 WL 4763414, at *17; *BarryDriller*, 915 F. Supp. 2d at 1148-49.

**V.**  **Public Policy Favors An Injunction**

Upholding copyright protection is in the public interest.  *Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18 (2003); *Autoskill*, 994 F.2d at 1499 ("In copyright cases, we think this factor normally weighs in favor of the issuance of an injunction because the public interest is the

27

interest in upholding copyright protections.").  As the *BarryDriller* and *FilmOnX* Courts held, "'it is virtually axiomatic that the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work.'"  *FilmOnX*, 2013 WL 4763414 at *17 (quoting *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983)); *BarryDriller*, 915 F. Supp. 2d at 1148; *accord ivi*, 691 F.3d at 287 (the "public has a compelling interest in protecting copyright owners' marketable rights . . . and the economic incentive to continue creating television programming" because, without these protections, the "store of knowledge" may be diminished, and "encouraging the production of creative work . . . ultimately serves the public's interest in promoting the accessibility of such works").

Further, Utah residents have a strong interest in continuing to receive the unique, local programming provided by the broadcast station plaintiffs.  If Plaintiffs' original programming is not protected from free-riders like Aereo, they will lose the financial resources necessary to produce this expensive programming.  *See ivi*, 765 F. Supp. 2d at 621 ("If Plaintiffs lose control over their products or potential revenue sources, they will lose valuable incentives to continue to create programming."); S. Rep. No. 102-92, at 42 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1133, 1175 (recognizing that the "vital local service" provided by broadcasting will be jeopardized if retransmitters are permitted to carry signals without paying programmers).  This interest is particularly high with regard to local news coverage which, in the vast majority of markets, comes almost exclusively from local broadcast stations.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue a preliminary injunction barring Aereo from retransmitting Plaintiffs' broadcasts and copyrighted programming over the Internet. To the extent the pending New York action raises concerns about principles of comity, Plaintiffs request that the injunction exclude the Second Circuit so as not to conflict with *WNET*. *See FilmOnX*, 2013 WL 4763414, at *18 (because the court's injunction against Aereo-like service conflicted with Second Circuit law, the injunction would apply everywhere but the Second Circuit).

Dated: October 7, 2013                                         Respectfully submitted,

                                                              */s/ Brent O. Hatch*
                                                              HATCH, JAMES & DODGE, PC
                                                              Brent O. Hatch
                                                              Shaunda L. McNeill

                                                              JENNER & BLOCK LLP
                                                              Richard L. Stone
                                                              Julie A. Shepard
                                                              Amy M. Gallegos

                                                              *Attorneys for Plaintiffs*
                                                              *Community Television of Utah, LLC, d/b/a*
                                                              *KSTU FOX 13, KUTV Licensee, LLC, d/b/a*
                                                              *KUTV and KMYU, and Fox Broadcasting*
                                                              *Company*