Rodney R. Parker (4110)
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, 11th Floor
Salt Lake City, Utah 84111
Telephone:  801.521.9000
Facsimile:  801.363.0400
rrp@scmlaw.com

John C. Ulin (*pro hac vice* to be filed)
ARNOLD & PORTER LLP
777 South Figueroa Street, Forty-Fourth Floor
Los Angeles, California  90017-5844
Telephone:  213.243.4000
Facsimile:  213.243.4199
john.ulin@aporter.com

Robert Alan Garrett (*pro hac vice* to be filed)
Hadrian R. Katz (*pro hac vice* to be filed)
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C. 20004
Telephone:  202.942.5000
Facsimile:  202.942.5999
robert.garrett@aporter.com
hadrian.katz@aporter.com

*Attorneys for Plaintiff Nexstar Broadcasting, Inc.*

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NEXSTAR BROADCASTING, INC., <br><br> Plaintiff, <br><br> vs. <br><br> AEREO, INC., <br><br> Defendant. | **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT** <br><br> Civil No. 2:13-cv-975 <br><br> Magistrate Judge Dustin B. Pead |

## TABLE OF CONTENTS

Page

MOTION FOR PRELIMINARY INJUNCTION .........................................................................1

INTRODUCTION AND SUMMARY ........................................................................................1

STATEMENT OF FACTS ...........................................................................................................6

    A.    Plaintiff And Its Programming..............................................................................6

    B.    Aereo's Unlicensed Broadcast Retransmission Service .........................................8

ARGUMENT ...............................................................................................................................9

I.     NEXSTAR IS LIKELY TO SUCCEED ON THE MERITS OF ITS
     CLAIM THAT AEREO'S UNAUTHORIZED COMMERCIAL
     RETRANSMISSION OF NEXSTAR'S PROGRAMMING
     CONSTITUTES COPYRIGHT INFRINGEMENT......................................................9

    A.    The Language And History Of The 1976 Copyright Act And
         Its Transmit Clause Make Clear That Aereo Publicly Performs
         Copyrighted Programming...................................................................................10

         1.    Aereo's Internet Broadcast Retransmission Service
             Falls Squarely Within The Plain Language Of The
             Transmit Clause. ....................................................................................10

         2.    Interpreting The Transmit Clause To Encompass
             Aereo's Broadcast Retransmission Service Is
             Consistent With, And Indeed Mandated By, The
             Legislative History And Policies Underlying The 1976
             Copyright Act.........................................................................................12

    B.    Aereo's Reliance Upon The Second Circuit's *Cablevision*
         Decision Is Misplaced..........................................................................................16

         1.    *Cablevision* Misinterpreted The Transmit Clause By
             Confusing The Statutory Terms "Performance" And
             "Transmissions" And By Writing Out The "Separate
             Times" Language. ....................................................................................17

         2.    *Cablevision* Does Not Immunize A Broadcast
             Retransmission Service Like Aereo From Copyright
             Liability..................................................................................................20

II.   AS OTHER COURTS HAVE PROPERLY CONCLUDED,
      UNAUTHORIZED INTERNET RETRANSMISSION OF BROADCAST
      TELEVISION PROGRAMMING CAUSES IRREPARABLE HARM TO
      BROADCASTERS SUCH AS NEXSTAR......................................................................23

III.  THE BALANCE OF HARMS TIPS DECIDEDLY IN FAVOR OF AN
      INJUNCTION PROHIBITING THE UNAUTHORIZED
      RETRANSMISSION OF NEXSTAR'S PROGRAMMING DURING
      THE PENDENCY OF THIS LITIGATION.....................................................................27

IV.   AN INJUNCTION PROHIBITING AEREO'S UNAUTHORIZED
      INTERNET RETRANSMISSION OF NEXSTAR'S COPYRIGHTED
      PROGRAMMING DURING THE PENDENCY OF THIS LITIGATION
      WOULD SERVE THE PUBLIC INTEREST. .................................................................28

CONCLUSION.............................................................................................................................29

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Am. Broad. Cos., Inc. v. Aereo, Inc.*,
    874 F. Supp. 2d 373 (S.D.N.Y. 2012) ................................................................16, 23, 26

*Autoskill Inc. v. Nat'l Educ. Support Sys., Inc.*
    994 F.2d 1476 (10th Cir. 1993),
    *overruled on other grounds by* 661 F.3d 495 (10th Cir. 2011) ...................................27, 28

*Cable News Network, Inc. v. CSC Holdings, Inc.*,
    No. 08-448, 2009 WL 1511740 (U.S. May 29, 2009) .....................................................21

*Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am., Inc.*,
    836 F.2d 599 (D.C. Cir. 1988), *cert. denied*, 487 U.S. 1235 (1988) ........................ passim

*Capital Cities Cable, Inc.* v. *Crisp*,
    467 U.S. 691 (1984) ........................................................................................................13

*Cartoon Network LP v. CSC Holdings, Inc.*,
    536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"),
    *cert. denied*, 557 U.S. 946 (2009) ............................................................5, 17, 20, 21, 22

*Fortnightly Corp. v. United Artists Television, Inc.*,
    392 U.S. 390 (1968) ("*Fortnightly*") ..............................................................................3

*Fox Television Stations, Inc. v. BarryDriller Content Sys. PLC*,
    915 F. Supp. 2d 1138 (C.D. Cal. 2012) ....................................................................... passim

*Fox Television Stations, Inc. v. FilmOn X LLC*,
    --- F. Supp. 2d ---, 2013 WL 4763414 (D.D.C. Sept. 5, 2013) .................................. passim

*Gates Rubber Co. v. Bando Chem. Indus., Ltd.*,
    9 F.3d 823 (10th Cir. 1993) ............................................................................................9

*Gen. Motors Corp. v. Urban Gorilla, LLC*,
    500 F.3d 1222 (10th Cir. 2007) ......................................................................................27

*Hearst Stations Inc. v. Aereo, Inc.*,
    --- F. Supp. 2d ---, 2013 WL 5604284, at *6 (D. Mass. Oct. 8, 2013) ..........................5, 23

*Hobby Lobby Stores, Inc. v. Sebelius*,
    723 F.3d 1114 (10th Cir. 2013) ......................................................................................9

*In re Cellco P'ship*,
    663 F. Supp. 2d 363 ........................................................................................................18

*Nat'l Cable Television Ass'n, Inc. v. Broad. Music, Inc.*,
    772 F. Supp. 614 (D.D.C. 1991) ....................................................................................15

*Newyas Inc. v. Mower*,
    543 F. Supp. 2d 1277 (D. Utah 2008).........................................................................26

*Red Baron-Franklin Park, Inc. v. Taito Corp.*,
    883 F.2d 275 (4th Cir. 1989), *cert. denied*, 493 U.S. 1058 (1990)..................................12

*Schumann v. Albuquerque Corp.*,
    664 F. Supp. 473 (D.N.M. 1987) ..............................................................................11

*Simpleville Music v. Mizell*,
    451 F. Supp. 2d 1293 (M.D. Ala. 2006) .......................................................................11

*Teleprompter Corp. v. Columbia Broad. Sys., Inc.*,
    415 U.S. 394 (1974).................................................................................................3

*Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*,
    805 F.2d 351 (10th Cir. 1986) ..............................................................................18, 27

*Twentieth Century Fox Film Corp. v. iCraveTV*,
    Nos. 00-121, 00-120, 2000 WL 255989 (W.D. Pa. Feb. 8, 2000) ...............................2, 23

*United States v. ASCAP*,
    627 F.3d 64 (2d Cir. 2010).......................................................................................18

*United States v. Handley*,
    678 F.3d 1185 (10th Cir. 2012) ................................................................................10

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
    192 F. Supp. 2d 321 (D.N.J. 2002) .............................................................................2

*Warner Bros. Entm't Inc. v. WTV Sys., Inc.*,
    824 F. Supp. 2d 1003 (C.D. Cal. 2011) ...................................2, 23, 24, 26, 28

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)....................................................................................................9

*WNET, Thirteen v. Aereo, Inc.*,
    712 F.3d 676 (2d Cir. 2013), *rehearing denied*, 722 F.3d 500 (2d Cir. 2013) .......... passim

*WPIX, Inc. v. ivi, Inc.*,
    765 F. Supp. 2d 594 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 275, 285-87 (2d Cir. 2012)......2, 23

## DOCKETED CASES

*Am. Broad. Cos., Inc. v. Hang 10 Techs., Inc.*,
    No. 09-6216, Dkt. No. 9 (D.N.J. Jan. 4, 2010) ................................................2

*CBS Broad., Inc. v. FilmOn.com, Inc.*,
    No. 10-cv-07532, Dkt. No. 49 (S.D.N.Y. Aug. 9, 2012)...................................2

*CBS Broad., Inc. v. FilmOn.com*,
    No. 10-cv-07532, Dkt. No. 8 (S.D.N.Y. Nov. 22, 2010).................................23

*Community Television of Utah, LLC v. Aereo, Inc.*,
 No. 2:13-cv-00910 (D. Utah filed Oct. 7, 2013) .................................................5

*ITV Broad. Ltd. v. TVCatchup Ltd.*, Case C-607/11 (European Court of Justice, Mar. 7,
 2013) .........................................................................................................................2

*The Public Performance Problem in Cartoon Network LP v. CSC Holdings, Inc.*,
 89 Or. L. Rev. 505, 541 (2010) .......................................................................6, 19

## STATUTES AND RULES

17 U.S.C. § 101 .........................................................................10, 11, 12, 14, 18

17 U.S.C. § 106 ......................................................................................2, 9, 14

17 U.S.C. § 504(c)(2) ...........................................................................................27

17 U.S.C. § 106(4) ...............................................................................................10

47 C.F.R. § 76.64 ...................................................................................................4

Fed. R. Civ. P. 65 ..................................................................................................1

## OTHER AUTHORITIES

2 Paul Goldstein, *Goldstein on Copyright* § 7.7.2.2 (3d ed. 2012) ...................6

11 Comm. on the Judiciary, 89th Congress, 1st Sess., *Supplementary Report of the
 Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965
 Revision Bill* (Comm. Print 1965) ..................................................................15

American Bar Association Section of Intellectual Property Law Past Action Book
 (2011-12) ..............................................................................................................6

Free Trade Agreement, U.S.-Austl., art. 17.4.10(b), May 18, 2004, 43 I.L.M. 1248 ....................2

H.R. Rep. 94-1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659 ...................3

Jane C. Ginsburg, *Recent Developments in US Copyright Law -- Part II, Caselaw:
 Exclusive Rights on the Ebb?* (Dec. 11, 2008) ......................................6, 19, 20

Jane C. Ginsburg, *WNET v. Aereo*: *The Second Circuit Persists In Poor (Cable)Vision*
 (The Media Institute, Apr. 23, 2013) ...................................................6, 8, 19

Jeffrey Malkan, *The Public Performance Problem in Cartoon Network LP v. CSC
 Holdings, Inc.*, 89 Or. L. Rev. 505 (2010) ........................................6, 15, 19

Peter Menell, *In Search of Copyright's Lost Ark: Interpreting the Right to Distribute in
 the Internet Age*, 2012 J. Copyright Soc'y of the U.S.A. (Aug. 26, 2011) ....................15

S. Rep. 102-92, at 42 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1133 ..........................29

U.S. Copyright Office, *Satellite Home Viewer Extension and Reauthorization Act:
 Section 109 Report* (June 2008) ..................................................................2, 16

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Nexstar Broadcasting, Inc. ("Nexstar") respectfully moves this Court pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction prohibiting Defendant Aereo, Inc. ("Aereo"), during the pendency of this litigation, from retransmitting Nexstar's copyrighted television programming over the Internet without authorization and in violation of the Copyright Act.  For reasons set forth below (and in the concurrently filed supporting declarations and exhibits), a preliminary injunction should be granted because Nexstar is likely to succeed on the merits of its copyright infringement claims; Nexstar will suffer irreparable harm in the absence of an injunction; the balance of equities tips in Nexstar's favor; and an injunction would serve the public interest.  Nexstar's proposed preliminary injunction order is set forth in Exhibit A.

## INTRODUCTION AND SUMMARY

Aereo streams live over the Internet -- 24 hours per day, seven days per week -- the copyrighted programming broadcast by multiple television stations, without the consent of the program owners, the stations or anyone else.  The stations that Aereo exploits include KTVX ABC4 ("KTVX") and KUCW CW30 ("KUCW") (collectively, "the Stations"), which Nexstar owns and operates within the Salt Lake City market.  Aereo sells its unlicensed broadcast retransmission service to subscribers who pay Aereo a monthly fee to view (on mobile devices and personal computers) the programming that Nexstar and others have created and compiled at great expense, effort and risk.  Aereo says it delivers the Stations only to paying subscribers within the Salt Lake City market.  However, Aereo's theory is that it may retransmit any broadcast station (and all of the programming on such station) to anyone located anywhere in the world, without any license to do so and without compensating the program or station owners.

**A.**

The Copyright Act affords owners of "motion pictures and other audiovisual works" the exclusive right "to perform the copyrighted work[s] publicly."  17 U.S.C. § 106(4).  Under the Transmit Clause, anyone who transmits a "performance . . . of [a] work" "to the public" by "means of *any* device or process" engages in public performance -- regardless of "whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times."  *Id.* § 101 (emphasis added).  Consistent with the Transmit Clause, courts repeatedly have enjoined commercial services that (like Aereo) stream over the Internet copyrighted works, including broadcast television programming, without licenses to do so.[1]

---

[1] *See, e.g.*, *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 277 (2d Cir. 2012) ("*ivi*"), *cert. denied*, 133 S. Ct. 1585 (2013); *Fox Television Stations, Inc. v. FilmOn X LLC*, --- F. Supp. 2d ---, 2013 WL 4763414, at *1 (D.D.C. Sept. 5, 2013) ("*FilmOnX*"); *Fox Television Stations, Inc. v. BarryDriller Content Sys. PLC*, 915 F. Supp. 2d 1138, 1140 (C.D. Cal. 2012) ("*BarryDriller*"); *CBS Broad., Inc. v. FilmOn.com, Inc.*, No. 10-cv-07532, Dkt. No. 49 (S.D.N.Y. Aug. 9, 2012) (consent judgment) (unpublished); *Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1012-13 (C.D. Cal. 2011); *Am. Broad. Cos., Inc. v. Hang 10 Techs., Inc.*, No. 09-6216, Dkt. No. 9 (D.N.J. Jan. 4, 2010) (consent judgment) (unpublished); *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 192 F. Supp. 2d 321, 332 (D.N.J. 2002); *Twentieth Century Fox Film Corp. v. iCraveTV*, Nos. 00-121, 00-120, 2000 WL 255989, at *1 (W.D. Pa. Feb. 8, 2000) (unpublished).

These decisions are consistent with international copyright norms.  *See, e.g.*, *ITV Broad. Ltd. v. TVCatchup Ltd.*, Case C-607/11 (European Court of Justice, Mar. 7, 2013), *available at* http://curia.europa.eu/juris/document/document.jsf?text=&docid=134604&pageIndex=0&doclan g=EN&mode=req&dir=&occ=first&part=1&cid=279461 (concluding that European Union copyright law prohibits the unauthorized retransmission of broadcast signals over the Internet).

These decisions also are consistent with international treaties that prohibit the United States from allowing Internet retransmissions of broadcast station programming without the consent of affected stations and copyright owners.  *See, e.g.*, Free Trade Agreement, U.S.-Austl., art. 17.4.10(b), May 18, 2004, 43 I.L.M. 1248, *available at* http://www.ustr.gov/trade-agreements/free-trade-agreements/australian-fta/final-text ("[N]either Party may permit the retransmission of television signals (whether terrestrial, cable, or satellite) on the Internet without the authorisation of the right holder or right holders, if any, of the content of the signal and of the signal . . . ."); U.S. Copyright Office, *Satellite Home Viewer Extension and Reauthorization Act: Section 109 Report* (June 2008), *available at* http://www.copyright.gov/reports/section109-final-report.pdf (the "Section 109 Report"), at 188 (citing free trade agreements with comparable provisions).

While anyone can receive broadcast television programming off-the-air without charge, a commercial enterprise such as a cable system (*e.g.,* Time Warner Cable or Comcast) or a satellite carrier (*e.g.,* DirecTV) -- one that inserts itself as a middleman and charges its subscribers to view such programming -- engages in public performances for which it must obtain copyright licenses.  This has been the law since at least 1976 when Congress expressly determined that the retransmission of broadcast television stations constitutes public performance, thereby legislatively overruling two Supreme Court decisions that had reached the contrary result under the 1909 Copyright Act.  *See* H.R. Rep. 94-1476, at 88-89 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5703-04 ("1976 Report") (discussing *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968) ("*Fortnightly*"), and *Teleprompter Corp. v. Columbia Broad. Sys., Inc.*, 415 U.S. 394 (1974) ("*Teleprompter*")).

In the 1976 Copyright Act, Congress

> addressed in particular this problem of "secondary transmissions." When a cable system takes a broadcast signal ("primary transmission") and delivers it to the system's subscribers ("secondary transmission"), the system is earning money by selling to its customers the copyrighted material licensed only for the primary broadcast transmission.   Under *Fortnightly* and *Teleprompter,* the copyright owner was unable to share directly in those revenues.   Congress was of the view that the copyright holders should receive direct compensation for the use of their rights.

*Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am., Inc.*, 836 F.2d 599, 602 (D.C. Cir. 1988), *cert. denied*, 487 U.S. 1235 (1988).   Congress concluded that cable systems are "commercial enterprises," whose "retransmission operations are based on the carriage of copyrighted program material," should pay copyright royalties to "the creators of such programs."  1976 Report at 89.

Aereo is precisely such a commercial enterprise.  Aereo provides the same type of broadcast retransmission service as do cable systems and satellite carriers, albeit over the Internet rather than over costly proprietary facilities that it has constructed and must maintain.  Unlike cable systems and satellite carriers, Aereo pays nothing to program owners or broadcast stations to provide its retransmission service.  And it refuses to comply with the governmental regulations applicable to cable systems and satellite carriers, including the regulations that require such services to obtain consent from a broadcast station before retransmitting its signal. *See* 47 C.F.R. § 76.64.

Not surprisingly, federal district courts in California and Washington, D.C. preliminarily enjoined an Internet retransmission service that claims it is identical in all material respects to Aereo.  *See FilmOnX*, --- F. Supp. 2d ---, 2013 WL 4763414, at *1; *BarryDriller*, 915 F. Supp. 2d at 1140.  As the court in *FilmOnX* correctly observed, such a service "is in no meaningful way different from cable television companies, whose relationship with broadcasters . . . was the primary motivation for the 1976 Act's enactment."  *FilmOnX*, --- F. Supp. 2d ---, 2013 WL 4763414, at *14; *accord BarryDriller*, 915 F. Supp. 2d at 1146.

**B.**

Several broadcasters and other content owners have brought copyright infringement actions against Aereo in New York, where Aereo initially launched its service.  Aereo has argued in the New York litigation that it makes only "private," not "public," performances because it has cleverly engineered its system so that each subscriber receives a separate retransmission of a program from her own "mini-antenna" and digital program recording.  In other words, Aereo's view is that it may stream over the Internet a telecast of the Super Bowl live to 50,000

subscribers; and yet, given the technology it employs, Aereo says it makes only 50,000 "private performances," not a public performance, of the Super Bowl.

Aereo's argument cannot be reconciled with the plain language and legislative history of the Transmit Clause, which make clear that Congress intended to bring all broadcast transmission services within the scope of the public performance right, regardless of how those services might be engineered. *See infra* pages 10-16.  Nevertheless, a sharply divided panel of the U.S. Court of Appeals for the Second Circuit (erroneously) accepted Aereo's argument based solely upon that court's decision in *Cartoon Network LP v. CSC Holdings, Inc*., 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"), *cert. denied*, 557 U.S. 946 (2009), which dealt with the copyright liability of an entirely different service ("remote storage" DVRs).  *See WNET, Thirteen v. Aereo, Inc.,* 712 F.3d 676 (2d Cir. 2013) (Chin J., dissenting), *rehearing denied*, 722 F.3d 500 (2d Cir. 2013) (Chin & Wesley, JJ. dissenting) ("*WNET*"), petition for writ of certiorari docketed No. 13-461 (S. Ct. Oct. 11, 2013).   A district court in Boston also relied heavily upon *Cablevision*, without making any independent analysis of the language and history of the Transmit Clause, when it refused to preliminarily enjoin Aereo's Boston service.  *See Hearst Stations Inc. v. Aereo, Inc.*, --- F. Supp. 2d ---, 2013 WL 5604284, at *6 (D. Mass. Oct. 8, 2013) ("*Hearst*").

Neither the U.S. Court of Appeals for the Tenth Circuit nor any other court within the Tenth Circuit has yet considered the *Cablevision* interpretation of the Transmit Clause, although the issue is pending before this Court in *Community Television of Utah, LLC v. Aereo, Inc.*, No. 2:13-cv-00910 (D. Utah filed Oct. 7, 2013).  However, as copyright scholars have explained, the court in *Cablevision* misconstrued the Transmit Clause by confusing distinct statutory terms

and reading language both into and out of the Transmit Clause.[2]   The courts in *BarryDriller* and

*FilmOnX*, based upon a careful analysis of the Transmit Clause and its legislative history,  have

agreed  and  wisely  have  refused  to  follow  *Cablevision.    See FilmOnX*,  --- F. Supp. 2d ---,

2013 WL 4763414, at *1, *4-6; *BarryDriller*, 915 F. Supp. 2d at 1143-46;  *accord, WNET*, 712

F.3d at 697-704 (Chin, J., dissenting); *WNET*, 722 F.3d at 503-12 (Chin and Wesley, JJ.,

dissenting from denial of rehearing *in banc*).   This Court should reach the same conclusion and

preliminarily  enjoin  Aereo's  unauthorized  retransmission  of  Nexstar's  copyrighted

programming.

## STATEMENT OF FACTS

### A.     Plaintiff And Its Programming

Nexstar owns and operates broadcast television stations KTVX and KUCW.  KTVX,

founded in 1946, was Utah's first television station and the first privately owned station in the

United States.   It is an ABC affiliate that serves the Salt Lake City television market, which

covers all of Utah and certain counties in neighboring states.   KTVX also is affiliated with the

MeTV network on its secondary digital channel.   KUCW began operations as an independent

station in the Salt Lake City market in October 1985 and is a CW affiliate.   Cable systems and

satellite carriers retransmit KTVX and KUCW to subscribers located throughout Utah and

surrounding areas.   They do so only after obtaining retransmission consent from Nexstar and the

---

[2]  *See, e.g.,* Jane C. Ginsburg, *WNET v. Aereo*:   *The Second Circuit Persists In Poor (Cable)Vision*  (The  Media  Institute,  Apr.  23,  2013),  *available  at* www.mediainstitute.org/IPI/2013/042313.php  ("Ginsburg,  *Poor  (Cable)Vision*");  Jane  C. Ginsburg, *Recent Developments in US Copyright Law -- Part II, Caselaw: Exclusive Rights on the Ebb?* at 25-26 (Dec. 11, 2008), *available at* http://ssrn.com/abstract=1305270 ("Ginsburg, *Recent Developments*"); 2 Paul Goldstein, *Goldstein on Copyright* § 7.7.2.2 (3d ed. 2012) ("Goldstein"); Jeffrey Malkan, *The Public Performance Problem in Cartoon Network LP v. CSC Holdings, Inc.*, 89 Or. L. Rev. 505, 541 (2010) ("Malkan").  *See also* American Bar Association Section of Intellectual Property Law Past Action Book at 72-73 (2011-12) (disapproving *Cablevision's* public performance holding).

necessary copyright licenses, pursuant to applicable law.  *See* Declaration of Richard Doutre'Jones at ¶¶ 8-9, 14-15, 18, 21-22 ("Jones Decl."), attached as Exhibit B.

Nexstar invests considerable resources to serve the Salt Lake City market with the best possible variety of entertainment, news, sports, and public interest programming.  In addition to providing ABC and MeTV network programming and programming obtained from other sources, KTVX has more local programming than any other station in Salt Lake City.  It creates and distributes over forty hours per week of original programming focusing on the Utah community.  This programming includes *ABC 4 News*, which airs seven times per day; *Good Morning Utah*, a weekday morning news program; and *Good Things Utah,* a local lifestyle/entertainment show that airs weekday mornings.  In addition, KUCW provides a nine minute news update at 9:00 p.m. each evening for viewers who want a quick daily news update. *See id.* ¶¶ 10-15.

Nexstar owns the copyrights in the programming that it produces and airs over the Stations, and it has exclusive licenses to air several network and syndicated programs produced by third parties.  Nexstar makes much of this programming available to Internet users on its own websites (in order to attract viewers to those websites) and, like other station and content owners, is actively exploring additional ways to distribute all the Stations' programming over the Internet and to mobile devices.  Nexstar, of course, cannot itself distribute the third-party programming on its own broadcast signals via the Internet or mobile devices without negotiating for the right to do so.  Yet Aereo does precisely that and effectively usurps the market that Nexstar and other station and content owners seek to develop legitimately.  *See id.* ¶¶ 13-15, 17, 18, 24-28, Exs. 1-3.

**B.      Aereo's Unlicensed Broadcast Retransmission Service**

Aereo launched its service in March 2012 by retransmitting only broadcast television stations licensed to the New York City market.  Recognizing that broadcasters and other content owners would bring infringement actions against it, Aereo confined its operations to the geographic boundaries of the Second Circuit so that it could avail itself of the perceived loophole created by the Second Circuit's *Cablevision's* decision.  *See WNET*, 712 F.3d at 697 (Chin, J., dissenting).  After the Second Circuit affirmed the denial of a preliminary injunction against Aereo, Aereo expanded its operations to include Atlanta, Boston, Dallas, Houston, Miami, Minneapolis and Salt Lake City; it also announced plans to enter more than two dozen other markets around the country.  Aereo commenced its Salt Lake City operation in August 2013, including the Nexstar Stations among its unlicensed offerings.  *See* Declaration of John Ulin ¶¶ 2-4, Exs. 2, 5-8 ("Ulin Decl."), attached as Exhibit C.

Aereo captures the signals of broadcast stations off-the-air utilizing numerous dime-size "mini-antennas" that it houses on circuit boards at a central location in each geographic market. When an Aereo subscriber wishes to view a particular program "live," she logs onto the Aereo website and clicks an on-screen program guide (similar to the guides offered by cable systems and satellite carriers).  Aereo then assigns an antenna, on a temporary basis, to that subscriber and that antenna tunes to the program requested.  Aereo's computers make a digital copy of the program and use that copy to retransmit the program over the Internet to the subscriber's computer or mobile device.  The subscriber views the program on her computer or mobile device just as she would view it on a television set.  *See WNET*, 712 F.3d at 680-83.

From an engineering standpoint, there is no need for Aereo to use thousands of mini-antennas (when one would suffice) or to make thousands of separate copies of each television program (when one, or indeed none, would suffice).  Aereo has acknowledged that its only

purpose for employing such inefficiency and artifice is to support an argument that, under the *Cablevision* decision, it need not compensate the owners of any of the broadcast programming off which it seeks to profit. *See WNET*, 712 F.3d at 697 (Chin, J., dissenting).

## ARGUMENT

A plaintiff is entitled to a preliminary injunction where it demonstrates: "(1) a likelihood of success on the merits; (2) a likely threat of irreparable harm to the movant; (3) the harm alleged by the movant outweighs any harm to the non-moving party; and (4) an injunction is in the public interest." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013) (en banc); *accord Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Each of these factors supports an order enjoining Aereo's unlicensed retransmission of Nexstar's programming during the pendency of this litigation .

**I.    NEXSTAR IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM THAT AEREO'S UNAUTHORIZED COMMERCIAL RETRANSMISSION OF NEXSTAR'S PROGRAMMING CONSTITUTES COPYRIGHT INFRINGEMENT**

"In order to prevail on a claim of copyright infringement, the plaintiff must show: (1) ownership of a valid copyright, and (2) copying by the defendant of protected components of the copyrighted material. . . . Copying is used herein as a shorthand reference to any infringement of the copyright holder's exclusive rights that are set forth at 17 U.S.C. § 106." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 831-32 & n.6 (10th Cir. 1993). It is undisputed that Nexstar own the copyrights in programs that Aereo streams over the Internet without Nexstar's authorization. *See* Jones Decl. ¶ 14, Ex. 1. Accordingly, Nexstar's likelihood of success turns on whether Aereo's broadcast retransmission service makes public performances, as defined by the Transmit Clause.

**A.    The Language And History Of The 1976 Copyright Act And Its Transmit Clause Make Clear That Aereo Publicly Performs Copyrighted Programming.**

"As to the principles of statutory construction involving federal statutes, '[i]t is our primary task in interpreting statutes to determine [C]ongressional intent, using traditional tools of statutory construction.  We begin by examining the statute's plain language.  If the statutory language is clear, our analysis ordinarily ends . . . . If the statute's plain language is ambiguous as to Congressional intent, we look to the legislative history and the underlying public policy of the statute.'"  *United States v. Handley*, 678 F.3d 1185, 1189 (10th Cir. 2012) (citations omitted).  The language of the Transmit Clause unambiguously establishes that Aereo's broadcast retransmission service makes public performances when it retransmits the same broadcast of a program to thousands, and potentially millions, of subscribers.  The legislative history and policy of the Copyright Act, as well as common sense, lead to the same conclusion.  Retransmitting the broadcast of the Super Bowl, or any other program, to thousands of paying subscribers constitutes a public performance of that copyrighted program.

**1.    Aereo's Internet Broadcast Retransmission Service Falls Squarely Within The Plain Language Of The Transmit Clause.**

Section 106(4) of the Copyright Act, 17 U.S.C. § 106(4), affords copyright owners the exclusive right to "perform the copyrighted work publicly."  Section 101 states that "[t]o perform or display a work 'publicly'" means:

> (1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or
>
> **(2) to transmit or otherwise communicate a performance** or display **of the work** to a place specified by clause (1) or **to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.**

10

*Id.* § 101 (emphasis added).  Clause (2) is the "Transmit Clause."  "To 'transmit' a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent."  *Id.*  "A 'device' . . . or 'process' is one now known or later developed."  *Id.*  To "perform" an audiovisual work means to "show its images in any sequence or make the sounds accompanying it audible."  *Id.*

Cable systems and satellite carriers come within the Transmit Clause because they deliver to multiple paying subscribers the same broadcast of a television program, *e.g.*, the 10:00 a.m. KTVX broadcast of *Good Things Utah*.  That broadcast constitutes a "performance of a work." *See Simpleville Music v. Mizell*, 451 F. Supp. 2d 1293, 1296, 1298 (M.D. Ala. 2006) ("[T]he law is settled that a radio broadcast constitutes a 'performance' within the meaning and coverage of copyright law.") (citations omitted); *Schumann v. Albuquerque Corp.*, 664 F. Supp. 473, 476 (D.N.M. 1987) ("[B]roadcasting is an additional performance which requires separate permission.").  Cable systems and satellite carriers retransmit that broadcast, the "performance of a work," to their numerous subscribers, who are members of the public.  *See* 1976 Report at 65 (retransmissions to "subscribers of a cable television service" constitute a public performance).

Aereo does precisely the same thing.  Like cable systems and satellite carriers, Aereo satisfies each element of the Transmit Clause.  It (1) "transmits" (communicates beyond the place from the images and sounds are sent); (2) "to the public" (multiple paying subscribers); (3) by "means of any device or process" "now known or later developed" (the mini-antennas and computers that capture and record the programs and stream them over the Internet ); (4) a "performance . . . of [a] work" (a particular broadcast of a copyrighted television program).  As the court in *FilmOnX* correctly concluded, "the plain language of the Transmit Clause applies" to an Internet retransmission service materially identical to *Aereo*, --- F. Supp. 2d ---, 2013

WL 4763414, at *13 n.11; *accord, WNET*, 712 F.3d at 698 (Chin, J. dissenting) ("Aereo's system fits squarely within the plain meaning of the [Transmit Clause]."); *BarryDriller*, 915 F. Supp. 2d at 1140-41, 1144-46 (likewise concluding that a service materially identical to Aereo comes within the plain meaning of the Transmit Clause).[3]

**2.  Interpreting The Transmit Clause To Encompass Aereo's Broadcast Retransmission Service Is Consistent With, And Indeed Mandated By, The Legislative History And Policies Underlying The 1976 Copyright Act.**

Rather than focus upon the plain language of the Transmit Clause, Aereo has urged courts to focus upon legislative history that, it incorrectly says, considers whether each individual transmission (rather than the same "performance of a work") reaches the public.  It is uncontroverted that an individual's retransmission of a broadcast to himself (or to family members or a small circle of friends) is not a public performance.  But the language and legislative history of the 1976 Copyright Act make clear that the for profit, commercial retransmission of the same broadcast to multiple strangers, which is the essence of Aereo's service, is precisely the activity that Congress determined in the 1976 Act to require copyright licenses.

Indeed, the most controversial issue that confronted Congress during its comprehensive revision of the 1909 Copyright Act was whether cable systems should incur copyright liability

---

[3] Under the Transmit Clause, Aereo also publicly performs a work if it transmits a performance of that work to "a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered . . . ."  17 U.S.C. § 101.  Aereo streams programming to mobile devices that invariably receive that programming in public places rather than in private households.  Thus, regardless of whether Aereo comes within the "to the public" prong of the Transmit Clause, its service, insofar as it involves transmissions to mobile devices located within public places, comes within the "public place" prong of the Transmit Clause.  *Cf. Red Baron-Franklin Park, Inc. v. Taito Corp.*, 883 F.2d 275, 279 (4th Cir. 1989), *cert. denied*, 493 U.S. 1058 (1990) (playing a copyrighted video game in an arcade constitutes a public performance because the work "may be viewed by the player, any persons accompanying him, and any other interested patrons of the video arcade").

for retransmitting broadcast signals.  *See* 1976 Report at 88-89.  Throughout the debate, the proponents of "no liability" made the same arguments as Aereo itself has made, *i.e.*, that broadcast stations offer their programming free over-the-air to the viewing public and cable systems (like Aereo) do nothing more than provide technology that allows consumers to do what they can do on their own.

Congress resolved the broadcast retransmission issue by concluding that commercial broadcast retransmission services, such as those offered by cable systems, must obtain copyright licenses and compensate copyright owners.  *See* 1976 Report at 89; *Capital Cities Cable, Inc.* v. *Crisp*, 467 U.S. 691, 709 (1984).  Congress reached that conclusion because, it determined, a commercial enterprise should not be allowed to build a business off the exploitation of copyrighted programming without compensating the owners of that programming.  1976 Report at 89.  Interpreting the Transmit Clause to encompass Aereo's broadcast retransmission service effectuates the policy judgment that Congress made in the 1976 Act concerning such services.

Aereo claimed in the New York litigation that because it uses technology different from that employed by the traditional cable systems that Congress considered in the 1976 Copyright Act, it should not be required to abide by the same copyright rules as other broadcast retransmission services.  But there is nothing in the language or history of the 1976 Act suggesting that the copyright liability of broadcast retransmission services turns upon the technology employed -- that it matters whether Aereo uses one antenna or multiple antennas or whether it makes no copies, one copy or multiple copies of a television program to support the retransmission of the performance of that program to paying subscribers.

To the contrary, the Transmit Clause states that transmitting a performance of a work to the public "by means of *any* device or process" "now known or later developed" is a public

performance.  17 U.S.C. § 101 (emphasis added).  Congress repeated the same "any device or process" language in the statutory definition of the term "transmit."  To "transmit" a performance of a work under the Act means to "communicate it *by any device or process* whereby images or sounds are received beyond the place from which they are sent.  *See id*. (emphasis added).  The definition of "device or process," which includes those "now known or later developed" (*id*.), further underscores the fact that Congress intended the Transmit Clause to capture all possible technologies, even those not in existence when the statute was enacted.

The legislative history confirms Congress's intent to embrace all types of transmission technologies within the Transmit Clause:

> The definition of "transmit" . . . is broad enough to include all conceivable forms and combinations of wires and wireless communications media, including but by no means limited to radio and television broadcasting as we know them.  Each and every method by which the images or sounds comprising a performance or display are picked up and conveyed is a "transmission," and if the transmission reaches the public in [any] form, the case comes within the scope of clauses (4) or (5) of section 106.

1976 Report at 64; *see also id*. at 63 (noting that a "performance may be accomplished 'either directly or by means of any device or process,' including all kinds of equipment for reproducing or amplifying sounds or visual images, any sort of transmitting apparatus, any type of electronic retrieval system, and any other techniques *and systems not yet in use or even invented*") (emphasis added).

Further, Congress expressly noted, the "approach of the [1976 Act] is to set forth the copyright owner's exclusive rights *in broad terms* in section 106, and then to provide various limitations, qualifications, or exemptions in the 12 sections that follow."  *Id*. at 61 (emphasis added).  Congress likewise "state[d] the public performance right in broad terms[.]"  *Id*. at 62. And it "enacted the transmit clause to make the performance right as broad as possible[.]"

Jeffrey Malkan, *supra,* 89 Or. L. Rev. at 541.  In doing so, Congress followed the advice of the

Register of Copyrights:

> Obviously no one can foresee accurately and in detail the evolving
> patterns in the ways author's works will reach the public 10, 20, or
> 50 years from now.  Lacking that kind of foresight, the bill should,
> we believe, adopt a general approach aimed at providing
> compensation to the author for future as well as present uses of his
> work that materially affect the value of his copyright . . . . A real
> danger to be guarded against is that of confining the scope of an
> author's rights on the basis of the present technology so that, as the
> years go by, his copyright loses much of its value because of
> unforeseen technical advances.

11 Comm. on the Judiciary, 89th Congress, 1st Sess., *Supplementary Report of the Register of*

*Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill* at 13-14

(Comm. Print 1965).  Congress "conceived of the exclusive rights broadly [and] encouraged

courts to interpret them so as to avoid their erosion as a result of unforeseen technological

changes[.]"  Peter Menell, *In Search of Copyright's Lost Ark: Interpreting the Right to Distribute*

*in the Internet Age*, 2012 J. Copyright Soc'y of the U.S.A., at 57-58 (Aug. 26, 2011), *available at*

http://papers.ssrn.com/sol3/ papers.cfm?abstract_id=1679514.

        In short, Congress made clear that it did not want copyright liability to turn on the

technical details of a transmission service and did not want the statute rendered obsolete by

changes in the technology used to communicate performances to the public.  Instead, Congress

drafted the statute flexibly to anticipate the inevitable development of future technologies, the

precise details of which could not be predicted in 1976.  "'It would strain logic to conclude that

Congress would have intended the degree of copyright protection to turn on the mere method by

which television signals are transmitted to the public.'"  *Nat'l Cable Television Ass'n, Inc. v.*

*Broad. Music, Inc.*, 772 F. Supp. 614, 650-51 (D.D.C. 1991) (internal citations omitted)

(concluding that cable networks publicly perform a program when they retransmit that program to the facilities of cable systems).[4]

### B.   Aereo's Reliance Upon The Second Circuit's *Cablevision* Decision Is Misplaced.

The case against Aereo is straightforward.   Aereo commercially exploits copyrighted programming without any license, providing the same type of service (a broadcast retransmission service) that Congress determined in the 1976 Copyright Revision Act must be licensed. Aereo's only defense is that it has designed its system to take advantage of a loophole that it believes the Second Circuit created in *Cablevision*.   As the district court in *WNET* observed, "[b]ut for *Cablevision*," Aereo's unlicensed retransmission service would be enjoined.   *Am. Broad. Cos., Inc. v. Aereo, Inc.*, 874 F. Supp. 2d 373, 375 (S.D.N.Y. 2012).   *Cablevision*, however, is not controlling in this Circuit and, as the courts in California and Washington, D.C. have concluded, *Cablevision* should not be followed because it misconstrued the Transmit Clause.   Even if the *Cablevision* interpretation of the Transmit Clause were correct (which it is not) , *Cablevision* should not be read to exempt an Internet broadcast retransmission service such as Aereo's from the requirement to obtain copyright licenses.

---

[4] During the more than thirty-five year since passage of the 1976 Act, several different types of broadcast retransmission services have emerged.   These services, like Aereo, have employed technologies that vary significantly from the technology utilized by cable systems at the time of the Act's passage.   *See* Section 109 Report at 19-34 (discussing use of microwave, satellites, open video, fiber, Internet Protocol TV and other technological advances to retransmit broadcast programming).   Even cable systems now use new technology to transmit programming, such as "switched video" which allows cable systems (like Aereo) to deliver individualized program transmissions to a subscriber only when requested by that subscriber.   *See id*. at 34-35, 194. Notwithstanding the use of different technologies, all these pre-Aereo services properly have been required to obtain public performance licenses because they are all engaged in the same commercial broadcast retransmission activity that, Congress determined, requires copyright licenses.

1.     *Cablevision* **Misinterpreted The Transmit Clause By Confusing The Statutory Terms "Performance" And "Transmissions" And By Writing Out The "Separate Times" Language.**

The *Cablevision* case involved a traditional cable system (Cablevision) that, unlike Aereo, had obtained and paid for licenses to retransmit copyrighted television programs on a live, real-time basis.  Cablevision also offered what it called a Remote Storage Digital Video Recording Service ("RS-DVR"), which enabled Cablevision to use the recording and playback equipment at its head-end to provide subscribers with the identical functionality of an in-home DVR recorder without having to install DVR equipment in every subscriber's home.   The Second Circuit concluded that, because the RS-DVR service was functionally identical to a consumer's in-home DVR device, Cablevision was not required to obtain a second set of licenses from copyright owners.  In reaching that conclusion, the court found that RS-DVR playbacks do not constitute public performances under the Transmit Clause.  536 F.3d at 123.

To permit the RS-DVR service to go forward, the *Cablevision* Court interpreted the Transmit Clause incorrectly by focusing upon the potential audience for *each individual transmission* -- rather than, as required by the plain language of the Transmit Clause, whether those individual transmissions contain the same "*performance of a work.*"  *See id*. at 139 ("[T]he transmit clause directs us to identify the potential audience of a *given transmission*, *i.e.*, the persons 'capable of receiving it,' to determine whether *that transmission* is made to the public.") (emphasis added).  The *WNET* court, over Circuit Judge Chin's dissent, determined that it was required to adhere to that interpretation under principles of *stare decisis* and therefore made no

separate analysis of the Transmit Clause and its applicability to broadcast retransmission services.  712 F.3d at 695.[5]

The error in the *Cablevision* Court's analysis is that, by focusing upon the potential audience for each *transmission*, the court replaced the term "performance" in the Transmit Clause with the term "transmission," thereby improperly rewriting the clause to read:

> to transmit or otherwise communicate a performance or display of the work  . . . to the public, by means of any device or process, whether the members of the public capable of receiving the ~~performance~~ **transmission** or display receive ~~it~~ **the transmission** in the same place or in separate places and at the same time or at different times.

"Transmit" and "perform," however, are each defined terms under the Copyright Act with distinct meanings.  *See* 17 U.S.C. § 101.  Section 101 of the Act defines the term "to perform" (and its "variant forms" (*id.*)) as meaning, in the case of audiovisual works, "to show its images in any sequence or to make the sounds accompanying it audible."  And it defines "to transmit" (and its "variant forms") as meaning to "communicate [a performance] by any device or process whereby images or sounds are received beyond the place from which they are sent."  *Id.*  Thus, "transmission" refers to the act of communicating sounds and images from one place to another, whereas "performance" refers to the act of rendering those sounds and images visible and audible.  *Id.*

As copyright scholars have correctly recognized, it was error for the court in *Cablevision* to substitute the term "transmission" for the different term "performance."  *See* Goldstein, *supra*, § 7.7.2.2 ("The error in the Second Circuit's construction of the transmit clause was to treat

---

[5]  There are two other decisions in the Second Circuit that relied upon *Cablevision's* interpretation of the Transmit Clause.  *See United States v. ASCAP,* 627 F.3d 64, 74-75 (2d Cir. 2010); *In re Cellco P'ship,* 663 F. Supp. 2d 363. 371-74 (S.D.N.Y. 2009).  Neither involved broadcast retransmission services such as Aereo's.

'transmissions' and 'performance' as synonymous, where the Act clearly treats them as distinct -- and different -- operative terms. . . . There can be little doubt that the italicized word *it* in the definition refers to 'performance or display,' not transmission . . . ."); Ginsburg, *Recent Developments*, *supra*, at 26 ("the court confused 'performance' and 'transmission'"); Ginsburg, *Poor (Cable)Vision*, *supra*, at 3 ("The Second Circuit conflated 'performance' with 'transmission' . . . . This reading does not work in terms of the statute."); Malkan, 89 Or. L. Rev. at 536, 553 (the court "thought that the words 'performance' and 'transmission' were interchangeable . . . [but] a transmission and a performance remain, technically and legally, two distinct things . . . . The principal error in the court's interpretation of the transmit clause was that it substituted the word 'transmission' for the word 'performance' in the phrase 'capable of receiving the performance . . . .'").

The *Cablevision* Court's erroneous substitution of the word "transmission" for "performance" led to a result that was exactly the opposite of what the statute means and what Congress intended.  To determine who is "capable of receiving" each distinct transmission required the Court to focus on the individual *transmissions* while ignoring the fact that the *performance* of the copyrighted works (*i.e.*, the particular broadcast of a television program) being communicated by the transmissions is "capable of being received" by all of Cablevision's subscribers.

By focusing on the individual transmissions in isolation, *Cablevision* reads the "different times" language out of the Transmit Clause.  *See* Ginsburg, *Poor (Cable)Vision*, *supra*, at 3 ("Reading the statute to equate 'transmission' with 'performance' reads 'different times' out of the statute.").  Two people cannot receive the same transmission of a performance at the same time.  As Professor Ginsburg has explained:

> The court's construction clashes with the text of the Act in another important way as well: it is not possible to transmit a performance "created by *the* act of transmission" to members of the public "at different times."  While such a "performance" could be transmitted simultaneously to differently located recipients, recipients differently situated in time cannot receive the same transmission.  The court's interpretation thus reads non simultaneous receipt out of the statute.

Ginsburg, *Recent Developments, supra*, at 26; *id.* at 25-26 ("Because the Act explicitly covers performances that are transmitted to members of the public who are separated in time, however, the Second Circuit's statutory construction cannot be correct.").

### 2.   *Cablevision* Does Not Immunize A Broadcast Retransmission Service Like Aereo From Copyright Liability.

Separate and apart from *Cablevision's* fundamental misinterpretation of the Transmit Clause, Aereo involves a type of service (a broadcast retransmission service) that the Second Circuit did not evaluate in *Cablevision*.  To the extent that a divided panel of the Second Circuit applied *Cablevision* to exempt the Aereo Internet retransmission service from public performance liability, it was wrong to do so and the *WNET* decision should not be followed in this case.  As Judge Chin correctly explained in dissent, there are "critical differences between Cablevision and [Aereo]."  *WNET*, 712 F.3d at 697; *see also id.* at 702 (explaining that "Aereo's system is factually distinct from Cablevision's RS-DVR" and "[t]hese differences undermine the applicability of *Cablevision* to Aereo's system").

*Cablevision* did not consider, much less disturb, the well-settled principle that commercial broadcast retransmission services (such as Aereo) must either qualify for a compulsory license or obtain copyright owner consent.  *Cablevision* dealt with an entirely different service.  Cablevision obtained "numerous" licenses for real-time transmissions of programming.  *See* 536 F.3d at 123.  The issue was whether Cablevision required additional licenses for subsequent transmissions of the same programming recorded at the direction of its

subscribers.  In stark contrast, this case involves a free-riding Internet service (Aereo) that has not obtained *any* license to retransmit copyrighted programming, either on a live or delayed basis.

The court in *Cablevision* "emphasize[d]" that it did not intend to exempt content delivery networks from copyright liability simply because they (like Aereo) associate unique copies of copyrighted works with each of their subscribers.  *See* 536 F.3d at 139.  The Government (through then-Solicitor General Elena Kagan and at the invitation of the Supreme Court) recommended that the Court not review the *Cablevision* decision because there was no circuit split and because the *Cablevision* court limited its decision to the facts of the case: "[A]lthough scattered language in the Second Circuit's [*Cablevision*] decision could be read to endorse overly broad, and incorrect, propositions about the Copyright Act, the court of appeals was careful to tie its actual holdings to the facts of this case.").  Brief of the United States as Amicus Curiae, *Cable News Network, Inc. v. CSC Holdings, Inc.*, No. 08-448, 2009 WL 1511740, at 6 (U.S. May 29, 2009).

The Government specifically noted that "while some aspects of the Second Circuit's reasoning [in *Cablevision*] on the public-performance issue are problematic," the decision "should not be understood to reach . . . other circumstances beyond those presented in this case." *Id.* at 21, 22.  The Government admonished that *Cablevision* should not be construed to "undermine copyright protection in circumstances far beyond those presented here, including with respect to VOD [Video-on-Demand] services or situations in which a party streams copyrighted material on an individualized basis over the Internet." *Id.* at 20-21.

Nonetheless the panel majority in *WNET* applied *Cablevision to a very different service --* a broadcast retransmission service -- without making any effort to reconcile its rote adoption of

21

*Cablevision*'s flawed statutory interpretation with Congress's intent to encompass broadcast retransmissions within the Transmit Clause.  Furthermore, under *Cablevision*, the central inquiry (incorrectly) concerned the "potential audience" of each transmission.  *See* 536 F.3d at 135, 137; *supra* pages 17-20.  Because Cablevision owns and manages the facilities over which it makes RS-DVR transmissions, Cablevision can ensure that each playback transmission of a stored program goes directly to the home of the subscriber who made the copy of that program and requested its playback.  *See* 536 F.3d at 124 (subscribers "receive playback of those programs through their home television sets"); *id.* at 126 (each playback transmission is "uniquely associated with one customer's set-top box and intended for that customer's exclusive viewing in his or her home") (citation and internal quotation marks omitted).  Accordingly, the only person "capable of receiving" (the "potential audience" for) each RS-DVR transmission from Cablevision was the subscriber who requested the copy used to make that retransmission.  *See id.* at 135 ("[O]nly one subscriber is capable of receiving any given RS-DVR transmission.").

That is not the case with Aereo.  Aereo does not make retransmissions over its own closed and managed facilities, as Cablevision does; nor does it confine those retransmissions to individual subscribers' homes.  Aereo's retransmissions travel via the Internet to mobile devices that may be located anywhere, including public places such as malls, airports, and stadiums.  *See supra* note.  Anyone with access to the mobile device may view the program being retransmitted.  Accordingly, the "potential audience" for the persons "capable of receiving" each Aereo retransmission is not just the one subscriber who receives RS-DVR retransmissions.  Under the very interpretation of the Transmit Clause adopted in *Cablevision*, Aereo makes public performances.

## II.   AS OTHER COURTS HAVE PROPERLY CONCLUDED, UNAUTHORIZED INTERNET RETRANSMISSION OF BROADCAST TELEVISION PROGRAMMING CAUSES IRREPARABLE HARM TO BROADCASTERS SUCH AS NEXSTAR.

Courts throughout the country have consistently held that unauthorized Internet streaming of television and video programming causes irreparable harm to copyright owners.  *See FilmOnX*, --- F. Supp. 2d ---, 2013 WL 4763414, at *15-*17; *BarryDriller*, 915 F. Supp. 2d at 1147; *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 617-20 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 275, 285-87 (2d Cir. 2012); *CBS Broad., Inc. v. FilmOn.com*, No. 10-cv-07532, Dkt. No. 8 (S.D.N.Y. Nov. 22, 2010) (unpublished); *iCraveTV*, 2000 WL 255989, at *8 (unpublished); *accord WTV Sys.*, 824 F. Supp. 2d at 1012-13.  Even the district courts in New York and Boston that declined to issue preliminary injunctions against Aereo recognized that copyright owners will suffer irreparable harm if Aereo is permitted to continue retransmitting broadcasts of their programs without their authorization.  *See Aereo*, 874 F. Supp. 2d at 396-400; *Hearst*, --- F. Supp. 2d ---, 2013 WL 5604284, at *8.

Irreparable harm is established where an infringing defendant's activities threaten to impair a copyright owner's control over its copyrighted works, threaten the goodwill and business reputation of the plaintiff, or threaten to cause loss of business or business opportunities.  *See*, *e.g.*, *FilmOnX*, --- F. Supp. 2d. ---, 2013 WL 4763414, at *15-*17; *BarryDriller*, 915 F. Supp. 2d at 1147; *ivi*, 691 F.3d at 285-87; *WTV Sys.*, 824 F. Supp. 2d at 1012-13.  Like other unlicensed retransmission services, Aereo threatens Nexstar with each of these recognized types of irreparable harm:

**Damaging Nexstar's Ability to Negotiate Retransmission Consent Agreements.** Aereo's unauthorized Internet retransmission of the copyrighted television programming broadcast by KTVX and KUCW threatens to impede Nexstar's ability to negotiate agreements

with cable and satellite providers, who must obtain consent to retransmit broadcast television stations under FCC rules. *FilmOnX*, --- F. Supp. 2d ---, 2013 WL 4763414, at *16; *BarryDriller*, 915 F. Supp. 2d at 1147; *ivi*, 691 F.3d at 285; *see* Jones Decl. ¶¶ 20-23. Retransmission consent fees are essential to local stations like Nexstar and are used to fund the acquisition and development of broadcast programming. If Aereo "can transmit [Nexstar's] content without paying a fee, [Nexstar's] existing and prospective licensees will demand concessions to make up the loss of viewership to non-paying alternatives" and may move "away from license-fee paying technologies and toward free technologies" like Aereo. *BarryDriller*, 915 F. Supp. 2d at 1147; *accord FilmOnX*, --- F. Supp. 2d ---, 2013 WL 4763414, at *16; *WNET*, 722 F.3d at 502 (Chin, J., dissenting from the denial of rehearing *in banc*); *ivi*, 691 F.3d at 285; *WTV Sys.*, 824 F. Supp. 2d at 1013; *see* Jones Decl. ¶¶ 20-23. As the Chairman of Dish Network (the second largest satellite TV provider in the United States) made clear in recent comments, Aereo "[i]s going to put some downward pressure on retransmission consent fees." *See* Ulin Decl., Ex. 13.

*Interference With Lawful Internet Television Distribution.* Aereo also threatens to interfere with Nexstar's ability to distribute its programming lawfully, including in the nascent Internet and new media markets. Jones Decl. ¶¶ 24-28, Exs. 2-3. Nexstar's Stations derive significant value from transmitting their content by streaming and providing other information on their websites (www.4utah.com and www.cw30.com) and the web-based applications. Viewers who visit the Stations' websites to watch programs represent a significant market for the Stations and an opportunity to build their viewership and loyal relationships with the viewers. In addition to building loyalty, Nexstar derives revenues from Internet advertising. A fundamental harm caused by Aereo, and services that may copy Aereo if it is not restrained, is the Stations' loss of control over how, when, and where their programming is transmitted and exploited. The value

of Nexstar's loss of loyalty, goodwill and connection that the Stations build with viewers through their Internet offerings, and the harm caused by Aereo's interference with Nexstar's ability to distribute its programming into lawful and licensed new media markets is irreparable and impossible to calculate in monetary terms. *FilmOnX*, --- F. Supp. 2d ---,  2013 WL 4763414, at *16; *BarryDriller*, 915 F. Supp. 2d at 1147; *WTV Sys.*, 824 F. Supp. 2d at 1014; *ivi*, 691 F.3d at 285-86.

      ***Harm to Other Important Business Relationships.***  Aereo's unlicensed retransmissions of the Stations' programming also threatens to damage Nexstar's relationships with other entities whose goodwill is critical to its stations' success, including syndicated content owners whose programming they broadcast.  Jones Decl. ¶¶ 29-30.  For example, neither KTVX nor KUCW has the right to transmit the majority of their popular syndicated or network programming over the Internet or to mobile devices.  Nor are the stations typically permitted to stream television advertising over the Internet.  By distributing the Stations' programming over the Internet, Aereo threatens to place Nexstar in breach of its agreements with content providers and advertisers and causes harm to the goodwill between Nexstar and its business partners.  Aereo also usurps rights in the programming that Nexstar itself does not possess, *i.e.*, by streaming network and syndicated content that Nexstar cannot lawfully stream over the Internet.  Ironically, Aereo is streaming programming from Nexstar's stations that Nexstar is not licensed to retransmit over the Internet.  Aereo thus uses content that Nexstar pays to broadcast over the Stations in ways that Nexstar is not lawfully able to do, in order to build a competitive business without paying for the programming.

      ***Harm to the Value of Advertising.***  Aereo threatens to undermine Nexstar's positions in negotiations with advertisers by diverting viewers from distribution channels measured by

Nielsen ratings, which are by far the most significant viewership measurements relied upon by advertisers in determining what to pay.  Jones Decl. ¶¶ 31-35.  Nielsen does not measure Aereo or offer any other industry-accepted measurement for audiences that watch live television over the Internet or on mobile devices.  The loss of measurable viewership to Aereo reduces the amounts advertisers will pay to place ads on Nexstar's stations.  Given the significance of advertising to Nexstar's business models, this harm is irreparable.  *FilmOnX*, --- F. Supp. 2d ---, 2013 WL 4763414, at *16; *BarryDriller*, 915 F. Supp. 2d at 1147; *Aereo*, 874 F. Supp. 2d at 397-98.

Courts throughout the country have repeatedly found these exact harms to be irreparable and to justify preliminary injunctive relief against defendants who stream broadcasts of copyrighted television programming over the Internet without authorization.  *See supra* at 23.  Injunctive relief is necessary because the irreparable harms that Aereo threatens are both significant and "neither easily calculable, nor easily compensable."  *BarryDriller*, 915 F. Supp. 2d at 1147 (quoting *WTV Sys.*, 824 F. Supp. 2d at 1013); *Aereo*, 874 F. Supp. 2d at 398 (finding "[h]arm of this sort has been accepted as irreparable based, at least in part, on the difficulty of . . . quantifying such damages"); *accord FilmOnX*, --- F. Supp. 2d. ---, 2013 WL 4763414, at *16 ("*BarryDriller* and *Aereo I* both accepted that these types of harm constituted irreparable injury. . . . This Court agrees."); *see Newyas Inc. v. Mower*, 543 F. Supp. 2d 1277, 1289 (D. Utah 2008) ("A finding of irreparable harm may be based on factors such as the 'difficulty in calculating damages . . . and [the] existence of intangible harms such as the loss of goodwill or competitive market position.'") (citation omitted).

Moreover, Aereo's likely inability to compensate Nexstar for the substantial damages that are accruing as a result of its massive infringement further supports a finding of irreparable harm.

*BarryDriller*, 918 F. Supp. 2d at 1147 ("Given the extent of Defendants' retransmissions, and the large statutory damages that may be available, it is unlikely that Defendants' . . . would be likely to be able to satisfy the damages award."); *ivi*, 691 F.3d at 286.  Nexstar and other copyright owners are entitled to recover statutory damages of up to $150,000 per copyrighted work infringed for Aereo's willful infringement of their copyrights over its system.  *See* 17 U.S.C. § 504(c)(2).  Aereo currently streams dozens of copyrighted programs every day in Utah alone. Aereo is unlikely to be able to satisfy the massive statutory damage award that may result if it is held liable for such extensive infringement in Utah and elsewhere.  Accordingly, monetary damages are likely to be insufficient and an injunction should issue.  *BarryDriller*, 918 F. Supp. 2d at 1147; *ivi*, 691 F.3d at 286; *accord Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986) (difficulty in collecting damages supports a claim of irreparable injury).

### III.   THE BALANCE OF HARMS TIPS DECIDEDLY IN FAVOR OF AN INJUNCTION PROHIBITING THE UNAUTHORIZED RETRANSMISSION OF NEXSTAR'S PROGRAMMING DURING THE PENDENCY OF THIS LITIGATION.

A copyright infringer's complaint that ceasing its infringing conduct will harm its business cannot defeat a request for preliminary injunction.  As the Tenth Circuit Court of Appeals has held, "the potential injury to an allegedly infringing party . . . 'merits little equitable consideration and is insufficient to outweigh the continued wrongful infringement.'"  *Autoskill Inc. v. Nat'l Educ. Support Sys., Inc.* 994 F.2d 1476, 1498-99 (10th Cir. 1993) (citation omitted), *overruled on other grounds by* 661 F.3d 495 (10th Cir. 2011); *see also Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1229 (10th Cir. 2007) ("We agree that when the case for infringement is clear, a defendant cannot avoid a preliminary injunction by claiming harm to a business built upon that infringement.").  Aereo's business is built upon copyright infringement.

The balance of harms therefore strongly supports Nexstar.  *FilmOnX*, --- F. Supp. 2d ---, 2013 WL 4763414, at *17; *BarryDriller*, 915 F. Supp. 2d at 1147-48.

## IV.  AN INJUNCTION PROHIBITING AEREO'S UNAUTHORIZED INTERNET RETRANSMISSION OF NEXSTAR'S COPYRIGHTED PROGRAMMING DURING THE PENDENCY OF THIS LITIGATION WOULD SERVE THE PUBLIC INTEREST.

"'It is virtually axiomatic that the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work.'"  *BarryDriller*, 915 F. Supp. 2d at 1148 (quoting *WTV Sys.*, 824 F. Supp. 2d at 1015); *accord FilmOnX*, --- F. Supp. 2d ---, 2013 WL 4763414, at *17; *ivi*, 691 F.3d at 288 (the "public has a compelling interest in protecting copyright owners' marketable rights . . . and the economic incentive to continue creating television programming" because, without these protections, the "store of knowledge" may be diminished, and "encouraging the production of creative work . . . ultimately serves the public's interest in promoting the accessibility of such works").  Indeed, according to the Tenth Circuit, "[i]n copyright cases, . . . this factor normally weighs in favor of the issuance of an injunction because the public interest is the interest in upholding copyright protections." *Autoskill*, 994 F.2d at 1499; *accord Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18 (2003).

Aereo threatens the revenue streams and business relationships that enable Nexstar's stations to develop, create and obtain valuable programming for broadcast to Utah viewers. Jones Decl. ¶¶ 36-37.  As a result, the public will suffer from a reduction in the quantity and quality of available local programming, from local news programs to coverage of local sports, elections, and other events, which cost millions of dollars to produce and which only local broadcasters such as the Stations have the necessary incentives to develop and deliver to the public.  *Id*. & Ex. 4.  The public interest plainly lies in enjoining copyright infringement that

threatens the continued viability of the vital local programming.  *See* S. Rep. 102-92, at 42 (1992), *reprinted in*  1992 U.S.C.C.A.N. 1133, 1175 (finding that local programming would be jeopardized if retransmitters were not required to obtain consent to retransmit local broadcast television signals).

## CONCLUSION

For all of these reasons, Nexstar respectfully requests that this Court enter a preliminary injunction that prohibits Aereo from retransmitting its broadcasts and copyrighted programming over the Internet without authorization.

Dated:  October 25, 2013                                   Respectfully submitted,


/s/ Rodney R. Parker
Rodney R. Parker (4110)
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, 11th Floor
Salt Lake City, Utah 84111
Telephone:  801.521.9000
Facsimile:  801.363.0400
rrp@scmlaw.com

John C. Ulin (*pro hac vice* to be filed)
ARNOLD & PORTER LLP
777 South Figueroa Street, Forty-Fourth Floor
Los Angeles, California  90017-5844
Telephone:  213.243.4000
Facsimile:  213.243.4199
john.ulin@aporter.com

Robert Alan Garrett (*pro hac vice* to be filed)
Hadrian R. Katz (*pro hac vice* to be filed)
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C. 20004
Telephone:  202.942.5000
Facsimile:  202.942.5999
robert.garrett@aporter.com
hadrian.katz@aporter.com

*Attorneys for Plaintiff Nexstar*
*Broadcasting, Inc.*