# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| COMMUNITY TELEVISION OF UTAH, LLC dba KSTU FOX 13, KUTV LICENSEE, LLC dba KMYU and KUTV, and FOX BROADCASTING COMPANY, | **MEMORANDUM DECISION AND ORDER GRANTING PRELIMINARY INJUNCTION AND STAY** |
| Plaintiffs, | **Consolidated Case No.  2:13CV910DAK** |
| vs. | **Judge Dale A. Kimball** |
| AEREO, INC., | |
| Defendant. | |
| NEXSTAR BROADCASTING COMPANY, | |
| Plaintiff, | |
| vs. | |
| AEREO, INC., | |
| Defendant. | |

This matter is before the court on Plaintiffs Community Television of Utah, LLC, KUTV Licensee, and Fox Broadcasting Company's Motion for Preliminary Injunction, Plaintiff Nexstar Broadcasting, Inc.'s Motion for Preliminary Injunction, Defendant Aereo, Inc.'s Motion to Stay Proceedings Pending the Supreme Court's decision in *ABC v. Aereo*, and Defendant Aereo's Motion to Transfer.  The court held a hearing on Aereo's Motion to Stay on February 7, 2014,

and a hearing on Plaintiffs Motions for Preliminary Injunction on February 11, 2014.[1]  At the

hearings, Plaintiffs Community Television of Utah, LLC, KUTV Licensee, and Fox Broadcasting

Company were represented by Brent O. Hatch, Shaundra L. McNeil, and Richard L. Stone,

Plaintiff Nexstar Broadcasting, Inc. was represented by Rodney R. Parker and John C. Ulin, and

Defendant Aereo was represented by Daralyn J. Durie, Joseph C. Gratz, Jess M. Krannich, and

Timothy Considine.  After carefully considering the parties' arguments, as well as the law and

facts relevant to the motions, the court enters the following Memorandum Decision and Order

## FACTUAL BACKGROUND[2]

Plaintiffs are a collection of local and national broadcast television companies who have

brought the present lawsuit against Aereo for copyright infringement.  Aereo enables its paying

customers to watch or record broadcast television programs on their computer, laptop, tablets or

other mobile devices.  Plaintiffs own or are the exclusive licensees in the copyrights to many

programs which Aereo is making available to its customers.

Cable systems and satellite carriers retransmit the content aired by Plaintiffs throughout

Utah and surrounding areas after obtaining retransmission consent and the necessary copyright

licenses from Plaintiffs.  Aereo, however, does not obtain retransmission consent or copyright

---

[1]  Although Aereo's Motion to Transfer was scheduled to be heard in connection with
Plaintiffs' Motions for Preliminary Injunction, the parties did not focus on the motion during oral
argument.  The motion was more than adequately briefed in the memoranda submitted by the
parties and the court considers the motion submitted on the briefs.

[2]  The court notes that the findings of fact and conclusions of law made by a court in
deciding a preliminary injunction motion are not binding at the trial on the merits.  *University of
Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *City of Chanute v. Williams Natural Gas Co.*,
955 F.2d 641, 649 (10th Cir. 1992), *overruled on other grounds, Systemcare, Inc. v. Wang Labs
Corp.,* 117 F.3d 1137 (10th Cir. 1997) (recognizing that "the district court is not bound by its
prior factual findings determined in a preliminary injunction hearing.").

licenses from Plaintiffs because it does not believe that its technology is subject to the same laws.

For a subscription fee, Aereo provides its customers with access to small remote antennas that enable the customer to watch and record over-the-air broadcasts over the Internet. Aereo's system captures over-the-air broadcasts from local television stations and creates digital copies of the broadcasts that Aereo can then stream over the Internet. Aereo maintains thousands of dime-sized antenna loops on circuit boards connected to computer equipment in an area that receives good broadcast reception. Each antenna is connected to its own tuner and feed lines and responds to an individual customer's commands. Once the customer sends a signal to watch or record a program, one of the many small antennas maintained by Aereo is then activated and tuned specifically for that customer. The customer can watch the broadcast with a brief delay or record the broadcast for later viewing.

Aereo's subscribing customers can log onto Aereo's website and view a television programming guide to select available programs to watch or record. Aereo likens its technology to what its customers could do on their own with an antenna, digital video recorder, and Slingbox. If Aereo's customers want to watch the program on their home televisions, rather than on their computers or mobile devices, they could do so with an internet-connected television or a device such as Apple TV or Roku.

In March 2012, Aereo initially launched its business only in the New York City market. It has been expanding the markets in which it does business and began doing business in Utah last July or August. Within approximately six weeks of Aereo's launch in Utah, Plaintiffs filed the present lawsuits, which the court later consolidated into this single action. The case was reassigned to several different judges for various reasons and the pending motions for preliminary injunction took several months to be heard. The case was reassigned to the

undersigned judge on February 7, 2014, and the motions were heard within a week of the reassignment.

In the meantime, an identical lawsuit brought by copyright owners of broadcast television programs against Aereo in the Southern District of New York and appealed to the Second Circuit Court of Appeals was granted a writ of certiorari by the United States Supreme Court in January 2014. The parties agree that the case should be stayed pending the Supreme Court's ruling. However, the parties disagree as to whether the case should be stayed with a preliminary injunction in place or not. Therefore, although the court heard arguments on Aereo's Motion to Stay first, the court proceeded to hear arguments on Plaintiffs Motions for Preliminary Injunction.

## LEGAL ANALYSIS

### Plaintiffs' Motions for Preliminary Injunction

Preliminary injunctive relief is appropriate if the moving party establishes: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *Roda Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). Because a preliminary injunction is an extraordinary remedy, the "right to relief must be clear and unequivocal." *SCFC LLC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991).

### A. Likelihood of Success on the Merits

Plaintiffs argue that Aereo's retransmission service infringes their copyrights. To prevail on a claim of copyright infringement, Plaintiffs must establish (1) ownership of a valid copyright, and (2) defendant's violation of any one of the five exclusive rights granted to copyright owners

under 17 U.S.C. § 106. *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 831-32 (10th Cir. 1993). It is undisputed that Plaintiffs own or are the exclusive licensee in programs that Aereo streams to its customers over the internet. The issue, therefore, is whether Aereo's conduct violates any of Plaintiffs' exclusive rights under the Copyright Act.

Plaintiffs contend that Aereo is violating their exclusive rights to perform their works publicly. The Copyright Act of 1976 grants copyright owners "of literary, musical, dramatic, and choreographic works, pantomines, and motion pictures and other audiovisual works" the exclusive right "to perform the copyrighted work publicly." 17 U.S.C. § 106(4). The term "perform" is defined in the Copyright Act as "to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible." *Id.* § 101.

The Copyright Act further defines what it means to perform or display a work "publicly" as follows:

> (1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or
>
> (2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

*Id.* Subsection (2), which is at issue in this case, is commonly referred to as the "Transmit Clause." Section 101 also defines "[a] 'device,' 'machine,' or 'process' [as] one now known or later developed." *Id.* And the term "transmit" is defined as follows: "To 'transmit' a

performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent." *Id.*

The parties have competing views of how these statutory definitions apply to Aereo's business and technology. Plaintiffs assert that the plain language of the statute applies to any device or process that is used to transmit their copyrighted works to people outside Aereo's circle of family and social acquaintances. This position finds support in two other district court cases and a dissent in Aereo's case in the Second Circuit Court of Appeals. *See Fox Television Stations, Inc. v. BarryDriller Content Systems,* 915 F. Supp. 2d 1138 (C.D. Cal. 2012); *Fox Television Stations, Inc. v. FilmOn X LLC*, 2013 WL 4763414 (D.D.C. Sept. 5, 2013); *WNET v. Aereo, Inc.*, 712 F.3d 676 (2d Cir. 2013) (Chin, J., dissenting). Aereo, however, relying on its case in the Second Circuit Court of Appeals, argues that the Transmit Clause does not apply to its technology because its technology merely enables its customers to view the copyrighted work privately. *See WNET v. Aereo, Inc.*, 712 F.3d 676 (2d Cir. 2013); *see also Hearst Stations Inc. v. Aereo, Inc.*, 2013 WL 5604284 (D. Mass. Oct. 8, 2013) (denying preliminary injunction to copyright holders).

This court is not bound by the holdings in the cases cited by the parties and there is no controlling law from the Tenth Circuit on this issue. Therefore, this court must make its own analysis of the whether the Transmit Clause applies to Aereo's activities. The court, however, has carefully reviewed each of the prior decisions and has concluded that the California and D.C. district court cases as well as Judge Chin's dissent in the Second Circuit case are the better reasoned and more persuasive decisions with respect to the proper construction of the Transmit Clause and its application to Aereo's operations.

"As to principles of statutory construction involving federal statutes, it is [the court's]

primary task in interpreting statutes to determine congressional intent, using traditional tools of statutory construction. We begin by examining the statute's plain language. If the statutory language is clear, our analysis ordinarily ends . . . If the statute's plain language is ambiguous as to Congressional intent, we look to the legislative history and the underlying public policy of the statute." *United States v. Handley*, 678 F.3d 1185, 1189 (10th Cir. 2012).

The plain language of the 1976 Copyright Act support Plaintiffs' position. The definitions in the Act contain sweepingly broad language and the Transmit Clause easily encompasses Aereo's process of transmitting copyright-protected material to its paying customers. Aereo uses "any device or process" to transmit a performance or display of Plaintiff's copyrighted programs to Aereo's paid subscribers, all of whom are members of the public, who receive it in the same place or separate places and at the same time or separate times. *See BarryDriller*, 915 F. Supp. 2d at 1144 (Copyright Act's definition section sets forth that "transmitting a performance to the public is a public performance."); *FilmOn X*, 2013 WL 4763414, at *13 (holding provisions of the 1976 Copyright Act are clear and apply to technology similar to Aereo's).

Because of the parties' dispute as to the meaning of the Transmit Clause and the split decisions in the prior cases on this subject, the court believes it is also helpful to review the history of the Transmit Clause. "The relevant history of the Transmit Clause begins with two decisions of the Supreme Court, *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 88 S. Ct. 2084, 20 L. Ed. 2d 1176 (1968), and *Teleprompter Corp. v. Columbia Broadcasting System, Inc.*, 415 U.S. 394, 94 S. Ct. 1129, 39 L. Ed. 2d 415 (1974)." *WNET*, 712 F.3d at 685. These decision were decided under the 1909 Copyright Act, "which lacked any analog to the Transmit Clause." *Id.* The cases arose in an era of changing technology and

involved the first community cable companies. *Id.* In *Fortnightly*, the cable company had

erected community antennas and connected homes to the antenna via coaxial cable. *Id.* Under

the prior Copyright Act, the Court found that the cable company, as an entrepreneur, could do

whatever a private citizen could do for itself without infringing the copyright. *Id.*

Congress then passed the Copyright Act of 1976 in response to the Supreme Court's

*Fortnightly* decision. "The 1976 Act was enacted as a complete overhaul of its predecessor, the

Copyright Act of 1909, to respond to 'significant changes in technology [that] affected the

operation of the copyright law." *FilmOn X*, 2013 WL 4763414 at *11 (quoting H.R. Rep. 94-

1476 (House Report) at 1 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5660). The House

Report further stated, "'Pursuant to two Supreme Court decisions [*Fortnightly* and

*Teleprompter*], . . . under the 1909 copyright law, the cable television industry has not been

paying copyright royalties for its retransmission of over-the-air broadcast signals.'" *Id.* (quoting

House Report, 1976 U.S.C.C.A.N. at 5703). "Congress found that 'cable systems are

commercial enterprises whose basic retransmission operations are based on the carriage of

copyrighted program material and . . . copyright royalties should be paid by cable operators to the

creators of such programs.'" *BarryDriller*, 915 F. Supp. 2d at 1146 (quoting House Report No.

94-1476, at 88-89 (1976)). Thus, the addition of the Transmit Clause in the 1976 Copyright Act

"was intended in part to abrogate *Fortnightly* and *Teleprompter* and bring a cable television

system's transmission of broadcast television programming within the scope of the public

performance right." *WNET*, 712 F.3d at 685 (citing House Report 94-1476, 1976 U.S.C.C.A.N.

5659, at 63 (1976)).

Aereo's retransmission of Plaintiffs' copyrighted programs is indistinguishable from a

cable company and falls squarely within the language of the Transmit Clause. It is undisputed

that Plaintiffs license its programming to cable and satellite television companies and through services such as Hulu and iTunes. These companies and services are providing paying customers with retransmissions of copyrighted works. Similarly, Aereo uses "any device or process" to transmit a performance or display of Plaintiff's copyrighted programs to Aereo's paid subscribers, all of whom are members of the public. However, Aereo's retransmissions are done without a license to do so.

Aereo's response to Plaintiffs' claims of copyright infringement is that it designed its system specifically to avoid the application of the Transmit Clause and in accordance with the Second Circuit's decision in *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"). In *Cablevision*, the Second Circuit concluded that the cable company's remote-storage DVR system did not result in an additional public performance under the terms of the Transmit Clause because each subscriber made a single unique copy. 536 F.3d at 139. Given that the cable company already had a license to transmit the performance, the only issue was essentially whether the customer's ability to record the performance required an additional license. *Id.* at 124. The cable company was splitting its licensed data stream, sending one stream to customers who were watching the program immediately and sending the other to a remote computer system maintained by the cable company that designated a portion of a hard drive for each customer who had requested the program to be recorded for later viewing. *Id.* at 124-25.

To reach its conclusion that the recorded copies for later playback did not require an additional license as a separate public performance, the Second Circuit proceeded to spin the language of the Transmit Clause, the legislative history, and prior case law into a complicated web. The court focused on discerning who is "capable of receiving" the performance to determine whether a performance is transmitted to the public. *Id.* at 134. However, such a focus

is not supported by the language of the statute.   The clause states clearly that it applies to any performance made available to the public.  Paying subscribers would certainly fall within the ambit of "a substantial number of persons outside of a normal circle of a family and its social acquaintances" and within a general understanding of the term "public."

However, the *Cablevision* court appears to discount the simple use of the phrase "to the public" because it concludes that the final clause within the Transmit Clause – "whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times"– was intended by Congress to distinguish between public and private transmissions.  This court disagrees.  The entire clause "whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times" appears to actually be Congress' attempt to broaden scope of the clause, not an effort to distinguish public and private transmissions or otherwise limit the clause's reach.  The term "whether" does not imply that the ensuing clause encompasses a limitation.  Rather, the introduction of the clause with the word "whether" implies an intent to explain the broad sweep of the clause and the many different ways it could apply to members of the public.  Reading this final clause expansively is consistent with Congress' intent to have the entire Transmit Clause apply to all technologies developed in the future.

Congress expressly used language throughout the definition section of the 1976 Copyright Act that would encompass all known or yet to be developed technologies.  In *FilmOnX,* the court recognized that "the aggregation of several new kinds of technology does not avoid the Copyright Act because Congress intended 'device or process' in the Transmit Clause to include 'all kinds of equipment for reproducing or amplifying sounds or visual images, any sort

of transmitting apparatus, any type of electronic retrieval system, *and any other techniques and systems not yet in use or even invented*.'" 2013 WL 4763414 at *14 (quoting House Report at 5677). The definition of "transmit" was also "broad enough to include all conceivable forms and combinations of wires and wireless communications media, *including but by no means limited to radio and television broadcasting as we know them*.'" *Id.*

The *Cablevision* court's analysis also appears to have changed the wording of the Transmit Clause from reading "members of the public capable of receiving the performance" to "members of the public capable of receiving the transmission." *See Cablevision*, 536 F.3d at 134. Therefore, instead of examining whether the transmitter is transmitting a performance of the work to the public, the *Cablevision* court examined who is capable of receiving a particular transmission. *See id.* at 135. This court agrees with Plaintiffs that the language of the Transmit Clause does not support such a focus.

Aereo asserts that there is legislative history to support the *Cablevision* court's interpretation of the Transmit Clause. The House Report states, "Although any act by which the initial performance or display is transmitted, repeated, or made to recur would itself be a 'performance' or 'display' under the bill, it would not be actionable as an infringement unless it were done 'publicly,' as defined in section 101." H.R. Rep. No. 94-1476, at 63 (1976). This language, however, merely points the court back to the standards expressed in the definitions of Section 101 to determine whether a performance is public or private. This language explains that the statute defines both "performance" and the more limited "to perform publicly." That a "public performance" is more limited than a "performance" speaks only to the unremarkable and indisputable fact that private performances exist. It is uncontroverted that an individual's retransmission of a broadcast to himself, his family, or circle of friends is not a public

performance. The court is still required, and directed by this legislative history, to apply the standards defining a public performance in the Transmit Clause.

This court is also not persuaded by the Second Circuit's subsequent application of its *Cablevision* decision to Aereo's system. *See WNET v. Aereo, Inc.*, 712 F.3d 676 (2d Cir. 2013). The court finds Judge Chin's dissenting opinion more persuasive than the majority opinion. As Judge Chin explained, there are "critical differences" between Aereo's situation and the cable company in *Cablevision*: "Cablevision involved a cable company that paid statutory licensing and retransmission consent fees for the content it retransmitted, while Aereo pays no such fees. Moreover, the subscribers in *Cablevision* already had the ability to view television programs in real-time through their *authorized* cable subscriptions, and the remote digital video recording service at issue there was a supplemental service that allowed subscribers to store that authorized content for later viewing. In contrast, no part of Aereo's system is authorized. Instead, its storage and time-shifting functions are an integral part of an unlicensed retransmission service that captures broadcast television programs and streams them over the Internet." *Id.* at 697 (Chin, J., dissenting).

The cable company in *Cablevision* was licensed to transmit the performance to its paying customers, who in turn decided to record the performance for later viewing. The *Cablevision* court's decision that the customer's subsequent viewing of the recording was a private viewing is not akin to Aereo's interception and retransmission of copyrighted programs to paying subscribers. "What Aereo is doing is not in any sense 'private.'" *Id.* at 699 (Chin, J., dissenting). This court agrees with Judge Chin that "[b]y any reasonable construction of the statute, Aereo is engaging in public performances" when it intercepts and retransmits copyrighted programs to paying strangers. *Id.*

Moreover, "[e]ven if the language of the transmit clause were ambiguous as applied to Aereo's system, the legislative history reinforces the conclusion that Aereo is engaging in public performances." *Id.* Aereo argues that it provides a service that its subscribers could do for themselves without infringing Plaintiffs' copyrights through the use of the subscriber's own antenna, television, digital video recorder, Slingbox, and computer or other mobile device. But, this is the same arguments from *Fortnightly* and *Teleprompter* which Congress specifically rejected when it passed the 1976 Copyright Act. *See BarryDriller*, 915 F. Supp. 2d at 1146.

Throughout the debates on the 1976 Copyright Act, the proponents of no copyright liability argued that broadcast stations offer their programming free over-the-air to the viewing public and cable systems do nothing more than provide technology that allows consumers to do what they can do on their own. Congress resolved the issue by concluding that commercial broadcast retransmission services must obtain copyright licenses and compensate copyright owners. "In the 1976 Copyright Act, Congress altered the definitions of 'perform' and 'publicly' specifically to render the CATV systems' unlicensed retransmissions illegal." *WNET*, 712 F.3d at 700 (Chin, J., dissenting) (citing *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 469 n.17, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984); H.R. Rep. No. 94-1476, at 63, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5676-77 ("[A] cable television system is performing when it retransmits the broadcast to its subscribers . . . .")). Congress reached that conclusion because it determined that a commercial enterprise should not be allowed to build a business off the exploitation of copyrighted programming without compensating the owners of that programming. *See* H.R. Rep. No. 94-1476, at 89.

Furthermore, as stated above, the legislative history makes clear that Congress intended the sweeping language of the Copyright Act to apply not only to cable television but any device

or process that could be developed in the future to transmit copyrighted works in any form to the public. *WNET*, 712 F.3d at 701 (Chin, J., dissenting) (citing H.R. Rep. No. 94-1476, at 64, *reprinted in* 1976 U.S.C.C.A.N. at 5678). The legislative history underscores Congress' desire to use definitions of terms such as "transmit" and "any device or process" to embrace future technologies. Congress made clear that it did not want copyright liability to turn on the technical details of a transmission service and did not want the statute rendered obsolete by changes in the technology used to communicate performances to the public. Even the majority decision in *WNET* recognized that "[p]erhaps the application of the Transmit Clause should focus less on the technical details of a particular system and more on its functionality." 712 F.3d at 694. This court finds no basis in the language of the Transmit Clause or the relevant legislative history suggesting that technical details take precedence over functionality. In fact, such a focus runs contrary to the clear legislative history.

Based on the plain language of the 1976 Copyright Act and the clear intent of Congress, this court concludes that Aereo is engaging in copyright infringement of Plaintiffs' programs. Despite its attempt to design a device or process outside the scope of the 1976 Copyright Act, Aereo's device or process transmits Plaintiffs' copyrighted programs to the public. Accordingly, the court concludes that Plaintiffs have met their burden of establishing a likelihood of success on the merits.

### B. Irreparable Harm

Under Tenth Circuit law, "[t]he party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). "It is also well settled that simple economic loss usually does not, in and of itself, constitute

irreparable harm, such losses are compensable by monetary damages." *Id.* "Rather, the irreparable harm findings are based on such factors as the difficulty in calculating damages, the loss of a unique product, and existence of intangible harms such as loss of goodwill or competitive market position." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1264 (10th Cir. 2004).

The parties dispute whether the financial harm to Plaintiffs during the pendency of this litigation is real or imminent. Aereo points to statements from Plaintiffs' executives to argue, essentially, that Aereo's infringement is a drop in the bucket for Plaintiffs. However, the court does not focus on financial harm in determining irreparable harm to the extent that it can be compensated with monetary damages. Rather, if Aereo were permitted to continue to infringe Plaintiffs' copyrights during the pendency of this litigation, Aereo's infringement will interfere with Plaintiffs' relationships and negotiations with legitimate licensees, impede and effect Plaintiff's negotiations with advertisers, unfairly siphon viewers from Plaintiffs' own websites, threaten Plaintiffs' goodwill and contractual relationships with Plaintiffs' licensed internet distributors, lose their position in the competitive marketplace for Internet content, and cause Plaintiffs to lose control of quality and potential piracy of its programming. All of these potential harms are intangible factors that support a finding of irreparable harm.

Every court that has considered the question of whether unauthorized Internet streaming of television and other video programming causes irreparable harm to the copyright owners has concluded that it does. *See, e.g., FilmOn X,* 2013 WL 4763414, at 15-17; *BarryDriller,* 915 F. Supp. 2d at 1147; *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 617-20 (S.D.N.Y. 2011). Plaintiffs have amply demonstrated that Aereo's infringing activities threaten to impair Plaintiffs' control over its copyrighted programs, threaten Plaintiffs' goodwill and business reputation and

relationships, cause Plaintiffs to lose business and standing in the marketplace, and subject Plaintiffs' copyrighted work to viral infringement and piracy. Accordingly, the court concludes that Plaintiffs have met the high burden required to demonstrate irreparable harm and this factor supports the issuance of a preliminary injunction.

### C. Balance of Harms

While the court has already addressed Plaintiffs' irreparable harm should a preliminary injunction not issue, Aereo argues that a preliminary injunction will cause its business devastating harm. The court, however, has already determined that Plaintiffs are likely to succeed on the merits of their copyright infringement claims against Aereo. And, the Tenth Circuit has held that "the potential injury to an allegedly infringing party . . . 'merits little equitable consideration and is insufficient to outweigh the continued wrongful infringement.'" *Autoskill Inc. v. Nat'l Educ. Support Sys., Inc.,* 994 F.2d 1476, 1498-99 (10th Cir. 1993). "[W]hen the case for infringement is clear, a defendant cannot avoid a preliminary injunction by claiming harm to a business built upon that infringement." *General Motors Corp. v. Urban Gorilla, LLC,* 500 F.3d 1222, 1229 (10th Cir. 2007).

In *FilmOn X*, the court reasoned that "[w]hile FilmOn X points out that its business could be crippled and that a decision in Plaintiffs' favor will chill technological innovation, these concerns are overstated" because a copyright infringer "has no cognizable interest in continuing to infringe Plaintiffs' copyrights and thus cannot complain of the harm it will suffer if ordered to cease doing so." 2013 WL 4763414, at *17. In this case, the harm to Aereo's business is limited only to its ability to expand into the geographic area of the Tenth Circuit. The harm to Aereo's business, therefore, will not put Aereo out of business, it merely impacts its expansion. Aereo took a calculated risk in designing its business around the *Cablevision* decision and a perceived

loophole in the 1976 Copyright Act. The court concludes that the balance of harms weighs in Plaintiffs' favor and supports the court's issuance of a preliminary injunction.

### D. Public Interest

In copyright cases, the Tenth Circuit has held that the public interest "factor normally weighs in favor of the issuance of an injunction because the public interest is the interest in upholding copyright protections." *Autoskill*, 994 F.2d at 1499. The Third Circuit has stated that 'it is virtually axiomatic that the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work." *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983). The public has an interest in continuing to receive unique, local programming provided by the Plaintiffs. Original local programming, covering local news, sports, and other areas of interest, costs millions of dollars to produce and deliver to the public and the public interest plainly lies in enjoining copyright infringement that threatens the continued viability of such local programming.

For the foregoing reasons, the court concludes that Plaintiffs have met their burden of demonstrating the need for a preliminary injunction during the pendency of this litigation. Accordingly, the court will enter Plaintiffs' requested  preliminary injunctions.

### E. Scope of Injunction

While 17 U.S.C. § 502 provides that injunctions granted "to prevent or restrain infringement of a copyright" "may be served anywhere in the United States on the person enjoined," this court recognizes that this decision conflicts with the decisions of the Second Circuit and the District of Massachusetts. Given the United States Supreme Court's impending decision on the issues presented by this motion, the court limits the scope of the injunction to the

Tenth Circuit.

### F. Bond

Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, the party requesting the preliminary injunction must provide security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Plaintiffs suggested a minimal bond in the amount of $10,000. Aereo has not presented evidence on potential damages. Other courts issuing preliminary injunctions in similar cases have imposed bonds in the amount of $250,000. *See FilmOn X*, 2013 WL 4763414 at *18; *BarryDriller*, 915 F. Supp. 2d at 1149. Given the limited geographic scope of the injunction, the court requires Plaintiff to post a bond in the amount of $150,000.

Therefore, Plaintiffs' Motions for Preliminary Injunction are GRANTED. Because Plaintiffs submitted their proposed Orders when the cases were assigned to other judges, the court directs Plaintiffs to re-submit their proposed Preliminary Injunction Orders, revised to reflect the ordered bond amount, as soon as practicable to the undersigned judge's electronic case filing email address.

### Aereo's Motion to Transfer

Aereo moves pursuant to 28 U.S.C. § 1404(a) to transfer this case to the Southern District of New York where the Honorable Judge Nathan is presiding over three suits between Aereo and various television broadcasters concerning the same technology and same legal issues. Section 1404(a) states, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Thus, in a motion to transfer venue, the moving party must clearly establish that: (1) the transferee court is a proper forum in which the action could have been brought originally; and

18

(2) the transfer will enhance the convenience of the parties and witnesses, and is in the interest of justice. *Van Dusen v. Barrack*, 376 U.S. 612, 616, 634 (1964); *See also Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1518 (10th Cir. 1991); *Texas Gulf Sulphur Co. v. Ritter*, 371 F.2d 145, 147 (10th Cir. 1967). The decision of whether to transfer an action is within the discretion of the trial court. *Wm. A. Smith Contracting Co., Inc., v. Travelers Indem. Co.*, 467 F.2d 662, 664 (10th Cir. 1972).

First, in order to prevail on a motion to transfer venue under 28 U.S.C. § 1404(a), the moving party must establish that the plaintiff could have properly filed the action in the proposed venue. A moving party must demonstrate that the transferor court is not only the proper venue, but would have personal jurisdiction over the defendant. *Chrysler Credit Corp. v. County Chrysler, Inc.*, 928 F.2d 1509, 1515 (10th Cir. 1991). Under 28 U.S.C. § 1400(a) actions relating to copyrights may be instituted in the district in which the defendant or his agent resides or may be found. Based on the allegations that Aereo began its business in New York and the pendency of the related cases in the Southern District of New York, the court concludes that Plaintiffs could have brought this action in the first instance in the Southern District of New York.

Second, Aereo argues that the Southern District of New York is the more appropriate forum because it would advance the interests of judicial efficiency, allow the parties to coordinate discovery, and serve the interests of Aereo in obtaining justice without undue costs. The moving party in a motion to transfer has the burden of demonstrating that the existing forum is inconvenient and that the transferee forum is more convenient. *Chrysler Credit Corp.*, 928 F.2d at 1515. The United States Supreme Court has held that "Section 1404(a) provides for transfer to a more convenient forum, not to a forum likely to prove equally convenient or inconvenient." *Van Dusen*, 376 U.S. at 646.

In evaluating a motion under Section 1404(a), the Tenth Circuit has established a number of factors for district courts to evaluate: (1) the plaintiff's choice of forum; (2) the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure the attendance of witnesses; (3) the cost of making the necessary proof; (4) the enforceability of a judgment if one is obtained; (5) relative advantages and obstacles to a fair trial; (6) difficulties that may arise from congested dockets; (7) the possibility of the existence of questions arising in the area of conflict of laws; (8) the advantage of having a local court determine questions of local law; and (9) all other considerations of a practical nature that make a trial easy, expeditious and economical. *Chrysler Credit Corp.*, 928 F.2d at 1516 (*quoting Tex. Gulf Sulphur Co. v. Ritter,* 371 F.2d 145, 147 (10th Cir. 1967)).

### 1. *Plaintiff's Choice of Forum*

A plaintiff's choice of forum should rarely be disturbed, "unless the balance [of factors] is strongly in favor of the movant." *Scheidt v. Klein*, 956 F.2d 963, 965 (10th Cir. 1992). However, "a plaintiff's choice of forum is afforded less deference when their choice of forum 'has little connection with the operative facts of the lawsuit'." *Tyson v. Pitney Bowes Long-Term Disability* Plan, 2007 WL 4365332 (D.N.J. Dec. 11, 2007) (*quoting Tischio v. Bontex.*, 16 F. Supp. 2d 511, 521 (D.N.J. 1998).

While Plaintiffs could have chosen to sue Aereo in New York, where Aereo does business, there is no evidence that Plaintiffs do any business or have any ties to New York. Community Television of Utah, LLC, which does business as KSTU Fox 13, is a Delaware LLC with its principal place of business in Salt Lake City, Utah. KUTV Licensee, LLC, which does business as KUTV and KMYU, is a Nevada LLC. KUTV's principal place of business is Salt Lake City, Utah, and KMYU's principal place of business is St. George, Utah. Fox Broadcasting

is a Delaware corporation with its principal place of business in Los Angeles, and Nexstar Broadcasting is a Texas-based Delaware corporation. There are no allegations that any of the Plaintiffs have had any kind of contact with or business dealings in New York. Even Aereo's recitation of the locations of these entities' parent companies failed to include any contacts with New York.

Moreover, the activities at issue in this copyright infringement case involve Aereo's allegedly infringing activities in Utah. Aereo does business in Utah and Plaintiffs allege that Aereo's expansion of its business into the Utah market has caused Aereo to infringe Plaintiff's copyrights in local programming, such as Talkin' Sports, Good Day Utah, and KUTV 2 News. These programs are locally produced and aired in only the Utah broadcasting market.

The court concludes that this factor weighs heavily against transfer to New York. Plaintiff have chosen Utah as the forum to adjudicate this action. Moreover, Utah has a much stronger connection to the operative facts of the lawsuit because the allegedly infringing activity is occurring in Utah.

### 2. Accessibility of Witnesses and Sources of Proof

The accessibility of witnesses and sources of proof weighs against transfer. The convenience of witnesses is the most important factor in deciding a motion under § 1404(a). *Cook v. Atchison, Topeka & Santa Fe. Ry. Co.*, 816 F. Supp. 667, 669 (D. Kan. 1993). To demonstrate a venue is inconvenient to witnesses, the movant must "(1) identify the witnesses and their locations; (2) 'indicate the quality or materiality of the[ir] testimony'; and (3) 'show[ ] that any such witnesses were unwilling to come to trial . . . [,] that deposition testimony would be unsatisfactory[,] or that the use of compulsory process would be necessary." *Employers Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1169 (10th Cir. 2010) (*quoting Scheidt v. Klein*,

956 F.2d 963, 965 (10th Cir. 1992)).

Although Aereo has expanded its business operations into Utah and has hundreds or thousands of small antennas to maintain and service in Utah, Aereo states that it does not believe it will have any witnesses who reside in Utah. Aereo also identifies witnesses with respect to potential damages who live outside of Utah. However, Aereo has not attempted to meet its burden with respect to identifying witnesses, explaining their unwillingness to attend trial, or how deposition testimony would be unsatisfactory. The Southern District of New York may be more convenient for Aereo's witnesses, but the court is required to consider all relevant witnesses. Aereo has not provided the court with the information to make this type of evaluation and, therefore, it has failed to meet its burden. Plaintiffs have identified its own witnesses who reside in Utah. Plaintiffs state that their key witnesses are employees of the local broadcasting stations and these witnesses reside in Utah. The court is left to conclude that Plaintiffs will have witnesses who reside in Utah and Aereo will have witnesses who reside in New York. As in any case, there will be some witnesses who are inconveniently located. Therefore, this factor does not weigh in favor of transferring the case to New York.

### 3. Costs of Making the Necessary Proof

The cost of making the necessary proof does not favor transfer. Aereo claims that it is being subjected to suits throughout the country and refers to the costs of litigating these suits. However, Aereo has chosen to do business throughout the country and is subject to suit in those districts. While one national broadcast company is a party to this action, several local broadcasting companies are also involved. Aereo fails to explain why the court should impose the extra cost of litigating in another state to the local broadcasting companies who do not appear to do any business in New York while Aereo chose to expand its business into Utah.

### 4. Enforceability of a Judgment

The enforceability of a judgment is not a factor at issue. A judgment issued in this district is enforceable in any district in the country.

### 5. Relative Advantages and Obstacles to a Fair Trial

Again, Aereo claims that overwhelming litigation costs are an obstacle to a fair trial and the interests of justice. However, as noted above, Aereo has chosen to do business throughout the country. It also took the risk of expanding its business based on what it perceived as a loophole in the Copyright Act identified in the decision of one circuit court of appeals. The fact that Aereo has to defend multiple actions in multiple districts where it does business does not present obstacles to a fair trial. Again, Aereo seeks to transfer a burden to Plaintiffs. This does not support a finding that there are obstacles to obtaining a fair trial in this district.

### 6. Difficulties that may arise from congested dockets

Aereo cites to statistics it claims indicate that the Southern District of New York is less congested than the District of Utah. However, the statistics show only a few months difference district wide. And, the district-wide statistics are not entirely relevant. This case has now been assigned to the undersigned senior judge who carries only a sixty percent case load. Once the case was reassigned, the motion to stay was immediately heard and the motion for preliminary injunction was heard within a few days. This court's docket is not congested. Therefore, the court cannot conclude that difficulties may arise from this court's docket or that this factor supports a transfer.

### 7. Conflict of Laws/ Questions of Local Law

Because this action is governed by the federal 1976 Copyright Act, this factor is irrelevant.

*8. All Other Considerations of a Practical Nature*

Aereo relies on case law stating that the presence of a related case in the transferee forum is a significant reason for transferring venue. The court agrees that the New York court has familiarity with the issues of the case and some efficiencies could be obtained. However, now that this court has heard and decided Plaintiffs' motions for preliminary injunction, this court has an equal familiarity with the legal issues.

In addition, this court does not agree that each new case brought by broadcasters favors transferring all the cases to Aereo's home state. Each new case is being brought because Aereo is expanding its business into new markets. Aereo repeatedly makes assertions that the large broadcasting companies are targeting it. Aereo fails to recognize that Plaintiffs are largely long-established local broadcasting entities located in the Utah broadcasting market. Many of the programs at issue are also long-established local programming. The fact that Aereo seeks to streamline this litigation into its home state is understandable. But Aereo chose to enter this market and its own business decision led to its potential to be subject to suit in this district.

The court must also recognize that all of the cases are at different stages of litigation. Whether there would be any real benefit as to efficiencies is questionable. Moreover, Aereo's concern as to inconsistent results will be resolved within a few months by the impending decision of the Supreme Court.

After reviewing all the relevant factors, the court concludes that Aereo has not established that a change of venue is justified under 28 U.S.C. § 1404(a).

## Aereo's Motion to Stay

Aereo moved to stay the proceedings in this case soon after learning that the Supreme Court granted certiorari in *American Broadcasting Companies, et al., v. Aereo, Inc.*, Case No.

13-461.  That case is the appeal from the New York action against Aereo in which the broadcasters' motion for preliminary injunction was denied and the denial was affirmed by the Second Circuit.  Both parties agree that this court has the discretion to stay the action and that such a stay would be appropriate in light of the Supreme Court's grant of certiorari.

However, the main dispute between the parties was whether to stay the case with or without hearing and deciding the motion for preliminary injunction.  Plaintiffs argue that the stay would amount to a procedural advantage and Aereo should not be allowed to continue its infringing activities while its Supreme Court case is pending.  Because the court was able to hear the two motions within a few days of each other, the court concluded that it was in the best interest of justice to consider the merits of Plaintiffs' Motions for Preliminary Injunction.

As explained above, the court concludes that Plaintiffs are likely to succeed on the merits of their copyright infringement claims and that Plaintiffs will be irreparably harmed if a preliminary injunction does not issue.  Therefore, the court finds that the requested stay pending the Supreme Court's decision in *ABC v. Aereo* should and will be entered with a preliminary injunction in place to protect Plaintiffs' copyrighted works.

## CONCLUSION

Based on the above reasoning, Plaintiffs Community Television of Utah, LLC, KUTV Licensee, and Fox Broadcasting Company's [Docket No. 5] and Nexstar Broadcasting, Inc.'s Motion for Preliminary Injunction [Docket No. 66] are GRANTED; Aereo's Motion to Transfer [Docket Nos. 30 & 67][3] is DENIED; and Aereo's Motion to Stay Proceedings Pending the Supreme Court's decision in *ABC v. Aereo* is GRANTED.   Upon this court's entry of Plaintiffs'

---

[3]  There are two docket numbers for Aereo's Motion to Transfer because Aereo filed a motion to transfer in both each case before consolidation.  The motion from Nexstar's case was re-entered into the docket of the lower-numbered action after consolidation.

requested preliminary injunctions, this matter is stayed pending the Supreme Court's decision in *ABC v. Aereo*.

DATED this 19th day of February, 2014.

BY THE COURT:

DALE A. KIMBALL
United States District Judge